537 F.2d 871
 John MIRABAL and Sharon Mirabal, Plaintiffs-Appellees and
Cross Appellants,
v.
GENERAL MOTORS ACCEPTANCE CORPORATION, a corporation, and Ed
Murphy Buick-Opel, Inc., a corporation,
Defendants-Appellants and Cross Appellees.
 Nos. 75--1048 to 75--1050.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 4, 1975.
Decided March 26, 1976.
Rehearing Denied April 19, 1976.
 
 Martin M. Ruken, Robert D. Hughes, Gary M. Elden, Chicago, Ill., for General Motors.
 Albert Koretzky, Chicago, Ill., for Mirabal.
 Before STEVENS, Circuit Justice,* MOORE, Senior Circuit Judge,** and SPRECHER, Circuit Judge.
 SPRECHER, Circuit Judge.
 
 
 1
 This appeal primarily concerns interpretations of certain provisions of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and regulations promulgated thereunder by the Federal Reserve Board, 12 C.F.R. § 226.1 et seq. (Regulation Z).
 
 
 2
 * The plaintiffs in this action, John and Sharon Mirabal, bought a new 1971 Buick Skylark from one of the defendants, Ed Murphy Buick-Opel, Inc., in July of 1971. The cash price for the car including service, accessories and taxes totalled $4,497.65. The Mirabals financed their purchase through General Motors Acceptance Corporation (GMAC), the other defendant to this action.[1] The Mirabals made a down payment of $2,296.65 including $600.00 in trade for their 1964 Rambler. The retail installment contract which the defendants provided the Mirabals required that they buy $259.00 of physical damage insurance for a total amount financed after deduction of the down payment of $2,460.00. A $511.80 finance charge was imposed on this and the total deferred payment price of $2,971.80 was to be paid in 36 monthly installments of $82.55 each. The installment contract disclosed the annual percentage rate on this transaction as 11.08 percent and contained a voluminous quantity of detailed requirements on its back, including provisions detailing the seller's rights upon default.
 
 
 3
 About one week after the transaction was consummated, GMAC sent a letter to the plaintiffs informing them that the annual percentage rate disclosed in the transaction had been understated by 1.75 percent and stating that the contract be corrected to provide for an annual percentage rate of 12.83 percent. The plaintiffs denied that they received any such letter. The trial court made no finding of fact on this issue
 
 
 4
 In late 1971, the Mirabals filed this action charging numerous violations of the Truth in Lending Act, the Illinois Motor Vehicle Retail Installment Sales Act, Ill.Rev.Stat., ch. 121 1/2, § 561 et seq. (1967) and the Illinois Sales Finance Agency Act, Ill.Rev.Stat., ch. 121 1/2, § 401 et seq. (1967) in connection with the transaction. The district court in a trial without a jury found that the defendants had violated the Truth in Lending Act in a number of ways, and had also violated both Illinois acts.
 
 
 5
 The district court found seven specific violations of Truth in Lending requirements in the transaction. For each violation of the Truth in Lending Act the court assessed damages of $1,000 against the defendants. Along with the damages under both Illinois acts, the plaintiffs won a judgment of more than $8,000. From this judgment, the defendants appealed and the plaintiffs cross-appealed.
 
 II
 
 6
 The Truth in Lending Act, enacted in 1968, was designed to provide the consumer with the information needed to compare the cost of different types of consumer credit and to enable the consumer to make the best informed decision in regard to his use of credit. The Act focused not on regulating consumer credit, but on requiring uniform disclosure of credit terms. To accomplish this, the Act required creditors to make certain disclosures of the terms and conditions of credit before consummating any transaction. Among the most important of these disclosures, the Act required disclosure of the dollar cost of credit as a finance charge and the relative cost of credit as an annual percentage rate. The disclosure requirements were to be enforced two ways, through administrative regulation and through private suits for civil penalties for violation of these requirements.
 
 
 7
 In 1974, Congress passed what it termed 'largely technical' amendments to the Truth in Lending Act.[2] Some of these amendments, as shall be seen later in this opinion, affect this suit. The amendments were enacted between the lower court judgment in the case and this appeal. A preliminary question which we face concerns whether these amendments are applicable in deciding this appeal.
 
 
 8
 Congress obviously wanted the amendments applicable to all suits pending in the courts whether on appeal or otherwise. Congress provided that certain provisions of the amendments, including all those provisions relevant to the present suit, 'shall apply in determining the liability of any person under . . . the Truth in Lending Act, unless prior to the date of enactment of this Act (Oct. 28, 1974) such liability has been determined by final judgment of a court of competent jurisdiction and no further review of such judgment may be had by appeal or otherwise.' Pub.L. No. 93--495, § 408(e), 88 Stat. 1518 (Oct. 28, 1974). However, the plaintiffs claim that such an application in this case would be unconstitutional.
 
 
 9
 Although the law in this area is not particularly clear,[3] what appears to this court dispositive of our question is the treatment of trial court judgments under the Fair Labor Standards Act with respect to the Portal to Portal Act, 29 U.S.C. §§ 251 et seq. This latter act was passed to bar enormous claims pending in the courts for overtime pay under what Congress believed to be an erroneous construction of the Fair Labor Standards Act. Although the effect of this act was to divest in the appellate courts many judgments for overtime wages already obtained in the trial courts, no court held this result impermissible.[4] The Supreme Court twice remanded labor cases to the district court for consideration in light of the Portal to Portal Act, after having in one already issued an opinion and in the other denied certiorari. See 149 Madison Avenue Corp. v. Asselta, 331 U.S. 795, 67 S.Ct. 1178, 91 L.Ed. 1432 (1947); Alaska Juneau Gold Mining Co. v. Robertson, 331 U.S. 793, 67 S.Ct. 1314, 91 L.Ed. 1839 (1947).[5] In the courts of appeals judgments for overtime wages which had been rendered in the trial courts prior to passage of the act were reversed on numerous occasions. E.g., McCloskey & Co. v. Eckart, 164 F.2d 257 (5th Cir. 1947). For a full list of these cases see 3 A.L.R.2d 1097, 1162 (annotation on the Portal to Portal Act). In one of the most lucid opinions on the question, a district court held that reversal on appeal because of subsequent legislation was constitutional:
 
 
 10
 Rights under the Fair Labor Standards Act came into existence only by virtue of an act of Congress. These rights did not exist at common law, nor were they established by the Constitution. Therefore, since these rights were created by the Congress, they may be taken away in whole or in part, or altered, by Congress which established them at any time before they have ripened into final judgment (meaning a judgment upon which no further appeal can be taken).
 
 
 11
 Ferrer v. Waterman S.S. Corp., 76 F.Supp. 601, 603 (D.P.R.1948).
 
 
 12
 This reasoning seems persuasive in the present situation. Civil actions under the Truth in Lending Act are rights created by Congress. Congress can repeal, amend or modify these rights in any way it sees fit. Under the reasoning that what Congress giveth, Congress can taketh away, we hold that the amendments must be applied in deciding this appeal.
 
 III
 
 13
 The facts are not in question in regard to the plaintiffs' major claim concerning a disclosure error under the Truth in Lending Act. The annual percentage rate disclosed in the contract was 11.08 percent. As all parties agree, this understated by 1.75 percent the annual percentage rate properly applicable to the finance charge, amount financed, and term of the Mirabals' contract. Thus, the defendants disclosed an erroneous annual percentage rate.[6]
 
 
 14
 The defendants contend that the error resulted from a bona fide mistake and claim exemption from liability under 15 U.S.C. § 1640(c).[7] This section provides:
 
 
 15
 A creditor may not be held liable in any action brought under this section for violation of this part if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.
 
 
 16
 Thus, we must determine whether the defendants have met the burden of section 1640(c).[8]
 
 
 17
 Under that provision, the creditors must prove first, that the error was an unintentional, bona fide error and second, that they maintained procedures reasonably adapted to avoid any such error. The first part of the test is met. Even the plaintiffs admit that the error was unintentional and that the defendants had no motive to understate the annual percentage rate. Clearly, the defendants' good faith is not in question.
 
 
 18
 In regard to the second part of the test, we will take the defendants' contentions on brief before this court as true. The defendants laid out their procedures in this manner:
 
 
 19
 Defendant dealer had specially trained office personnel to assist salesmen in determining annual percentage rates for instalment contracts. Those office personnel had been trained in the preparation of Truth in Lending disclosure statements at educational meetings that defendant GMAC held with each GM dealer before the Act went into effect. At these meetings, GMAC used a chart easel presentation to explain full disclosure, the new type of contracts, the establishment of rates, and how to arrive at rates. GMAC held classes at the premises of every one of the 48 GM dealers in the area in June 1969 to prepare the dealers to work under the Act. In addition, GMAC sent to all General Motors dealers materials and a form of contract designed to aid compliance under the Truth in Lending Act. These materials included rate charts and tables which were less awkward to use than those provided by the Federal Reserve Board. GMAC prepared these materials after extensive consultation with the Federal Reserve Board and Federal Trade Commission. A manual sent by GMAC to all GM dealers emphasized the need for the accurate statement of annual percentage rates:
 
 
 20
 These terms (including annual percentage rate) have been called the 'common denominators' of consumer credit. If comparison shopping for credit terms is to become a feature of the consumer credit business, federal authorities believe that these two disclosures will make it possible regardless of the type of credit extended. The federal effort is to make such disclosures clearly visible in every consumer transaction.
 
 
 21
 The defendants concluded by suggesting that the error in the disclosure statement arose in copying numbers from an interest conversion table.[9]
 
 
 22
 These efforts, as outlined by the defendants, are impressive. Clearly, they indicate that the defendants established procedures designed to correctly calculate the figures required. However, this does not answer the question. We must decide whether this showing meets the requirements of § 1640(c), whether the defendants have shown that they maintained procedures reasonably adapted to avoid bona fide errors.
 
 
 23
 Congress had no intention of having the consumer bear the burden of a creditor's negligence. As was noted in the Senate hearings on the Act, the philosophy behind its passage was not 'let the buyer beware' but 'let the seller make full disclosure.'[10] In a similar vein, the fifth circuit has noted that the policy in the area of consumer credit has shifted from one of caveat emptor to one of caveat vendor.[11] Moreover, as courts have noted on numerous occasions, the Act should be interpreted liberally in favor of the consumer to effectuate its broad remedial purpose.[12] With this in mind we can examine the provision.
 
 
 24
 As we have already noted, the provision for our purposes has basically two requirements, that the error be a bona fide error and that the creditor maintain procedures reasonably adapted to avoid such errors. A bona fide error is an error made in the course of a good faith attempt at compliance.[13] The statute says that these errors are the precise errors which must be avoided. Therefore, the statute requires a higher burden than merely good faith compliance. In other words, Congress required more than just the maintenance of procedures which were designed to provide proper disclosure calculations. Rather, it required procedures designed to avoid and prevent the errors which might slip through procedures aimed at good faith compliance. This means that the procedures which Congress had in mind were to contain an extra preventative step, a safety catch or a rechecking mechanism. Congress left the exact nature of the preventative mechanism undefined. It is clear, however, that Congress required more than just a showing that a well-trained and careful clerk made a mistake. On the other hand, a showing that the first well-trained clerk's figuring was checked by a second well-trained clerk or that one clerk made the calculations on an adding machine and then checked this by looking up the figures on a table would satisfy Congress' requirements. We save for future determination what procedures, other than rechecking, might also satisfy this requirement.[14]
 
 
 25
 Congress required not only that procedures designed to avoid bona fide errors be established by creditors if they seek exemption under this section but also, that these procedures be maintained. This means that the creditor must show that the proper procedures were followed time in and time out. As we noted in an earlier opinion, the exemption was provided to avoid imposing 'strict liability' for unavoidable clerical errors upon creditors. Haynes v. Logan Furniture Mart, Inc., 503 F.2d 1161, 1167 (7th Cir. 1974). In the face of a showing that procedures containing a rechecking mechanism or other preventative device existed and were maintained consistently by a creditor, a court could conclude that whatever error occurred was unavoidable and that the congressional policy of requiring creditors to do everything reasonably possible to avoid disclosure errors was fulfilled.
 
 
 26
 In the present case the defendants made neither of these showings. Their procedures, although probably designed to provide correct disclosures, did not contain any type of preventative mechanism for catching disclosure errors. Moreover, the defendants did not show that these procedures were maintained consistently. Indeed, in the present instance the defendants do not seem to know what procedures were followed in generating the figures for the Mirabals' contract.[15] Therefore, since the defendants did not meet the burden of establishing their right to an exemption under section 1640(c), they are liable for the inaccurate disclosure of the annual percentage rate in the Mirabals' contract.[16]IV
 
 
 27
 We now turn to three questions concerning whether multiple civil penalties may be assessed on inaccurate disclosures arising from one credit transaction.
 
 
 28
 * First, plaintiffs press us to find other errors in the disclosure statement as did the trial court and they urge that for each failure to disclose they are entitled to a separate statutory penalty as the court below allowed. Thus, they seek multiple recovery under the Act for multiple errors committed in the disclosure statement.
 
 
 29
 The recent amendments to the Act, however, foreclose the possibility of multiple recovery for multiple errors in the disclosure statement. The amendments provide in part (15 U.S.C. § 1640(g)):
 
 
 30
 The multiple failure to disclose to any person any information required under this part to be disclosed in connection with a single account under an open end consumer credit plan, other single consumer credit sale, consumer loan, or other extension of consumer credit, shall entitle the person to a single recovery under this section but continued failure to disclose after a recovery has been granted shall give rise to rights to additional recoveries.
 
 
 31
 This clearly bars multiple recoveries for multiple failures to disclose.[17]
 
 
 32
 Practical considerations obviously motivated Congress to adopt this view. The penalty provisions of the Act were designed as an enforcement mechanism, not as a source of windfall gains for obligors. If an obligor is successful in an action against a creditor, he will recover twice the finance charge imposed up to $1,000 free and clear, as his costs, and attorney's fees will also be recovered. Any actual damages may be recovered on top of this award. 15 U.S.C. § 1640(a)(1). Furthermore, if multiple recoveries were granted for multiple disclosure errors, how would a court determine the number of disclosure errors committed? For instance, if a disclosure statement were omitted entirely, a court would have no way of computing the number of errors made in such a total failure. If twice the finance charge were equal to or greater than $1,000, the award could range anywhere from $1,000 (for the one failure of omitting the disclosure statement) to $50,000 or more (for failure to follow every rule and regulation which the court could find applicable to the transaction). Such a result would be highly undesirable. For the reasons noted, it is clear that multiple failures to disclose in any one transaction do not give rise to multiple recoveries. Therefore, the plaintiffs' claim of other disclosure errors need not be considered.
 
 B
 
 33
 Next, the plaintiffs urge that each defendant should be held separately liable under the Act and that the plaintiffs' recovery should be doubled as a result. The wording of the Act appears to support the plaintiffs' claim. The civil liability provision provides in relevant part that 'any creditor who fails to comply with any requirement (of the Act) with respect to any person is liable to such person--(for twice the finance charge up to $1,000 plus attorney's fees).' 15 U.S.C. § 1640(a) (emphasis added). The legislative history uses similar 'any creditor' language.
 
 
 34
 In most consumer credit transactions in which there are two creditors, one has sold the other the consumer credit contract in question. This is the situation in the present case. Thus, only one of the creditors is receiving the benefit of the finance charge, and in effect only one is providing the credit. Furthermore, as in the present situation where the dealer was following procedures established by the finance agency (GMAC), it would seem harsh to impose separate penalties on both creditors for basically a single failure on their part. The statutory language 'any creditors' is not dispositive on this point, as it could refer to the fact that Congress intended liability for disclosure violations to reach each and every creditor rather than just the creditor who held the credit contract or the one who made it. And thus, it need not imply that the joint creditors are separately liable under the Act. Moreover, any holding that the creditors here are separately liable would require only a change of dealings to avoid. Instead of GMAC buying the contract from the dealer, GMAC would have its own agents on the dealer's premises to arrange the extension of credit and would by this means exclude the dealer as a creditor. This result seems pointless. Since holding creditors separately liable on a single consumer credit transaction appears inconsistent with the general purposes of the Act and mandated by neither the statutory language nor practical considerations, we find the plaintiffs' pleas for such an extension of liability unconvincing. The creditors in this transaction, having acted jointly, are jointly liable under the Act.[18]
 
 C
 
 35
 Finally, the plaintiffs urge that since they were each obligors in the transaction, they should each be allowed to recover a separate penalty. The statutory language supports such a construction. Section 1640(a), as amended, reads as follows:
 
 
 36
 Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or part D of this subchapter with respect to any person is liable to such person in an amount equal to the sum of--
 
 
 37
 (1) any actual damage sustained by such person as a result of the failure;
 
 
 38
 (2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000; . . .
 
 
 39
 (3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. (Emphasis added.)
 
 
 40
 This appears to indicate that Congress felt that the duty of the creditor ran to each obligor involved in a loan transaction and that for a failure to fulfill this duty each obligor could sue and recover.[19]
 
 
 41
 Some courts have found separate recoveries by joint obligors barred by the section dealing with general disclosure requirements, 15 U.S.C. § 1631. E.g., St. Marie v. Southland Mobile Homes, Inc., 376 F.Supp. 996 (E.D.La.1974). This section reads in part:
 
 
 42
 (a) Each creditor shall disclose clearly and conspicuously, in accordance with the regulations of the Board, to each person to whom consumer credit is extended, the information required under this . . . chapter.
 
 
 43
 (b) If there is more than one obligor, a creditor need not furnish a statement of information required under this . . . chapter to more than one of them.
 
 
 44
 These courts have equated 'statement of information' with the general requirement to disclose. From this, they have concluded that since subparagraph (b) requires only one statement be given to joint obligors, the creditor has failed to disclose (and hence is liable) only to the obligor to whom the statement is given.
 
 
 45
 We have recently answered these contentions in Allen v. Beneficial Finance Co. of Gary, 531 F.2d 797, 805--806 (7th Cir. 1976). There we said:
 
 
 46
 The flaw in this reasoning is twofold. First, the reasoning assumes that Congress intended that subparagraph (b) limit the general disclosure requirement of subparagraph (a). There is little to support this assumption. Congress could have assumed that even though a creditor need provide only one disclosure statement, he would disclose to all obligors the information required. Certainly, multiple obligors are expected to look at and rely upon the one statement given.[20]
 
 
 47
 Secondly, even if the creditor need only disclose to one of multiple obligors, this does not limit the right of other obligors to recover if disclosure to the one has been faulty. Congress could have expected all obligors to be protected by proper disclosure to only one in that the one who received disclosure would certainly take the best credit terms available. Faulty disclosure, however, would destroy this protection. Certainly, the other obligors would be as harmed as the one who received the faulty disclosure.
 
 
 48
 Congress appears to have included subparagraph (b) merely to facilitate compliance with the Act. As the House Report states:
 
 
 49
 In order to reduce needless paperwork, disclosure need only be made to one obligor. For example, if two people (e.g. a husband and wife) are the obligors, only one copy of the contract with the required disclosure information would need to be furnished.
 
 
 50
 H.R.Rep. No. 1040, 90th Cong., 1st Sess. (1967) (to accompany H.R. 11601), 1968 U.S.Code Cong. & Admin.News, pp. 1962, 1984.[21]
 
 
 51
 Above all, however, the wording of subparagraph (b) provides the best clue to Congress' intent. Congress did not say disclosure need only be given to one of multiple obligors. Nor did it say that recovery may only be had by one. It said a 'statement of information' need only be furnished to one of multiple obligors. From all this we can conclude that Congress by including subparagraph (b) meant only to reduce the burden of paperwork on the creditor, and did not mean to foreclose any right of recovery by a joint obligor.
 
 
 52
 No other provision in any way implies a limitation on the right of joint obligors to recover separately under the Act. The language of the civil liability section is clear: 'Any creditor who fails to comply (with this Act) with respect to any person is liable to such person in an amount equal to the sum of' actual damages, the lesser of twice the finance charge or $1,000, and attorney's fees. Without more convincing evidence that Congress intended some other result, the command of such language cannot be ignored. The creditors in this action have failed to give proper disclosures to both John and Sharon Mirabal. Thus, they are liable to both, separately, for the statutory penalty of $1,000.
 
 
 53
 Practical considerations support this result. First, as noted in Rivers v. Southern Discount Company Atlanta II, 4 CCH Consumer Credit Guide, P98,796 at 88,450 (N.D.Ga.1973), the creditor by requiring two signatories on a loan, gains additional security in the form of a joint obligor. Thus, it seems appropriate that his obligations under the Act and the punishment for failure to live up to these obligations should be commensurate with this greater security acquired. Furthermore, a holding that joint obligors could recover only one penalty would create problems in administering the Act. For instance, if one obligor sued would he be allowed the full penalty or only half of it? If granted the full penalty, could the other obligor sue the winner for his half? Which obligor could sue, only the one who received the disclosure statement? How could a court determine as between husband and wife joint obligors which of the two had received the disclosure statement? Congress, in the statute, provided no answers for these questions and so we can assume that it did not expect these problems to arise.
 
 V
 
 54
 As a final matter, we must decide whether the defendants have violated the two state acts regulating consumer automobile financing, the Illinois Sales Finance Agency Act, Ill.Rev.Stat. ch. 121 1/2, §§ 401 et seq., and the Illinois Motor Vehicle Retail Installment Sales Act, Ill.Rev.Stat. ch. 121 1/2, §§ 561 et seq. The court below found the defendants had both violated the Installment Sales Act, and that defendant GMAC had violated the Sales Finance Agency Act.
 
 
 55
 The Motor Vehicle Installment Sales Act provides that 'no person who violates this Act . . . may recover any finance charge . . ..' Ill.Rev.Stat. ch. 121 1/2, § 584(b). The plaintiffs contend that the defendants violated the Act in two major ways, first by failing to state the correct annual percentage rate and second, by failing to include all 'default, delinquency or similar charges' in the contract.
 
 
 56
 We have already noted that the understatement in the annual percentage rate was the result of a bona fide error. The penalty provision of the statute, section 584(b), provides an exception for bona fide errors. It states:
 
 
 57
 No person who violates this Act, except as a result of an accident or bona fide error of computation, may recover any finance charge . . ..
 
 
 58
 There are no other requirements to meet this exception, and thus, the defendants cannot be held liable under Illinois law for the error in disclosing the annual percentage rate.
 
 
 59
 The plaintiffs' second contention, that not all 'default, delinquency, and similar charges' are disclosed in the contract 'clearly, conspicuously and in meaningful sequence' as required in section 565(12) of the Illinois Act is disposed of by the Federal Reserve Board regulations. The State of Illinois has adopted these regulations to conform its interpretation of its act to the interpretation given to the very similar Truth in Lending Act.[22] In interpreting 15 U.S.C. § 1638(a)(9), which requires 'default, delinquency, or similar charges payable in the event of late payments' to be disclosed in a consumer credit transaction, the Board in the regulations has not provided much clarification of the statutory language. See 12 C.F.R. § 226.8(b)(4). In later interpretations rendered upon this regulation, however, the Board has clarified its position. The Board views the statute as requiring the disclosure of only those charges which become automatically due and payable in the event of a late payment.[23] In the present transaction the only charge that fits this description is the automatic late payment penalty of '5% of the unpaid installment or $5 whichever is less.' The charges of which the plaintiffs complain and which are not included in the disclosure statement--such as charges for attorney's fees, costs of repossession and sale of repossessed property--are all imposed at the creditor's election and thus are not automatic. These charges, therefore, need not be included in the disclosure statement.[24] Thus, under Illinois law these charges need not be disclosed in compliance with the Motor Vehicle Retail Installment Sales Act, and no violation has occurred.
 
 
 60
 The Illinois Sales Finance Agency Act provides for penal damages in the amount of one-fourth of the principal amount of the loan for violations of that act. Ill.Rev.Stat. ch. 121 1/2, § 416. These damages are applicable at the discretion of the court, and the trial court allowed plaintiffs to recover the full 25 percent on top of other damages awarded.
 
 
 61
 The trial court found that GMAC had purchased a retail installment contract 'which on its face violated the Illinois Motor Vehicle Retail Installment Sales Act' because the contract disclosed an incorrect annual percentage rate. Although the trial court made no reference to the specific sections of the Sales Finance Agency Act which the purchase of the contract violated, it must have meant to refer to Section 8.4 of the Act, Ill.Rev.Stat. ch. 121 1/2, § 408.4. This section provides:
 
 
 62
 Except for honest mistake, purchase of any retail contract, retail charge agreement, or evidence of indebtedness thereunder, which on its face violates this Act, the Retail Installment Sales Act or the Motor Vehicle Retail Installment Sales Act (violates this Act).
 
 
 63
 However, as we have already noted, the mistake here was an honest error and it was made by GMAC's agent, the dealer. Furthermore, the trial court did not find that the mistake was patent or obvious as the statute requires. Clearly, the mistake was not obvious as GMAC only found it after having received the contract by refiguring the percentage rate. No other provision of the Act appears applicable. Therefore, GMAC is not liable under the Illinois Sales Finance Agency Act.
 
 
 64
 The judgment for the plaintiffs is affirmed as modified by reducing the amount of the judgment to $2,000.00 plus costs and attorney's fees and the cause is remanded for further proceedings.
 
 
 65
 STEVENS, Circuit Justice (concurring).
 
 
 66
 There are two brief comments that I wish to add. First, I have no doubt about the constitutionality of the general rule that an appellate court must apply the law in effect at the time it renders its decision. See Thorpe v. Housing Authority, 393 U.S. 267, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474, 484. Second, although I am persuaded that defendants did not meet their burden under § 1640(c) in this case, I am not sure that their evidence was insufficient as a matter of law. With these reservations I join Judge Sprecher's opinion.
 
 MOORE, Senior Circuit Judge (dissenting):
 
 67
 Since I regard appellants' conduct as having completely complied both with Congressional intent in enacting the Truth in Lending Act (the 'Act') and with making an accurate disclosure of the financial obligations of the purchasers as required by the Act, I must dissent from the majority opinion which in my opinion is based primarily on its views that appellants should have maintained a more error-proof bookkeeping department. Since the annual interest percentage calculation mistake did not affect the amount payable by appellants, it scarcely fits into the category of a misrepresentation or material omission. Nor can I reconcile the majority's finding of good faith with the result they reach. The facts as I read the record disclose that on July 14, 1971 John and Sharon Mirabal (as co-buyers) signed a 'Retail Installment Contract' on the occasion of their purchase of a new 1971 Buick from the seller-dealer Ed Murphy, a defendant herein. They financed the purchase by making a cash down-payment of $1696.65, by receiving a $600 credit on their turned-in 1964 Rambler and by financing the balance through GMAC on a thirty-six (36) months installment basis, which balance included the unpaid price of the car ($2,201), required physical damage insurance ($257) and a finance charge ($511.80).
 
 
 68
 All apparently went well for about six weeks when John Mirabal received a notice from Motorists Insurance Corporation (the insurer) that his insurance had been cancelled. He went to an attorney 'for the insurance, for them cancelling me.' The insurance is not involved in this case but the attorney 'went in and dug out' information and tole Mirabal that there had been an increase in the annual finance charge (Tr. 54). Other than his belief that the annual percentage rate had been increased, Mirabal had no other complaints. Factually, there is no basis for the claim that the change in the percentage rate affected the finance charge as disclosed in the Contract. Mirabal testified 'Q. Did you (sic) payment go up when the annual percentage rate was changed? A. No. * * * Q. The payments remained the same, is that correct? A. Yes.' There was no increase in the finance charge, as Mirabal recognized by referring to the monthly payment specified in the Contract, which was $82.55 and by answering the question 'Q. What are you paying now? A. $82.55'. (Tr. 58). In fact, Mirabal's counsel so stipulated. (Tr. 59).
 
 
 69
 These undisputed facts refute the fallacious fact assumption by the district court and the majority that the mistaken percentage figuration would have resulted in a downward adjustment in a total of $69.38. To the contrary, the Mirabals' financial obligation would not have been altered by one penny.
 
 
 70
 However, the attorney's excavations went deep and he 'dug up' enough theories under Sections 121 and 128 of the Truth in Lending Act (15 U.S.C. §§ 1631 and 1638), the Illinois Motor Vehicle Retail Installment Sales Act and the Illinois Sales Finance Agency Act as to cause the trial judge to enter a judgment in favor of plaintiffs jointly against GMAC and Ed Murphy jointly for $7,000 (seven violations--$1,000 each); against the same defendants jointly for $511.80 (the finance charge) under the Illinois Retail Installment Sales Act; and against GMAC for $615. under the Illinois Sales Finance Agency Act--a total of $8,126.80. On top of these amounts was to be an attorney's fee to be fixed by the court. All this arising out of the purchase of a $4,497.65 Buick.
 
 
 71
 The amended complaint is based primarily on alleged failures to disclose information which it is claimed is required by the provisions of the Act. These alleged failures as stated in the complaint are 'failing to make necessary disclosures of default, delinquency and similar charges, including attorney's fees, storage charges, collection expenses, sales expenses, interest, unearned finance charges resulting from acceleration on default' (par. 7a); 'failing to make such disclosures clearly, conspicuously and in meaningful sequence by not placing such disclosures adjacent to or near disclosures concerning installment due dates' (per. 7c); 'failing to make all such disclosures above or adjacent to the place for the customer's signature' (par. 7d); failure to disclose retained security interests (par. 7e); failure to use charts or tables to determine the annual percentage rate; failure to disclose that the rate should have been 12.83% instead of 11.08% as originally (until corrected) had been inserted in the contract; and failure to include certain charges not individually itemized in the finance charge.
 
 
 72
 To arrive at a proper decision attention must be focused primarily on the Contract itself and the statute and regulations with which it had to conform.
 
 
 73
 According to Congress' own declaration the Act had as its purpose 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit. . . .' Congress declared that '(T)he informed use of credit results from an awareness of the cost thereof by consumers' (15 U.S.C., Sec. 1601). Thus far Congress has used, as the most significant, two expressions 'awareness of the cost' and 'meaningful disclosure of credit terms'--both expressions being completely subjective in nature. And, akin to that other anomaly in the law--that mythical and fictitious character the 'reasonably prudent man'--the task of determining a subjective standard by objective criteria is left to the courts. Both 'awareness' and 'meaningful' must, of necessity, depend upon the capacity for understanding by the individual involved. Obviously, the laws cannot be written for separate intellectual levels. What will be meaningful to a C.P.A. business school graduate may not have any meaning to one who has not even had a grammar school education. Even the courts are not impervious to such bewilderment--witness the vast number of decisions under this very Truth in Lending Act on identical issues which have produced diametrically opposite results.[1] As to 'awareness', the range would be even wider. There is no requirement of law that the potential purchaser of a car take an examination to establish his 'awareness' of the manifold but necessary intricacies of contracts.
 
 
 74
 The Congress must have sensed these problems when it bestowed on the Board of Governors of the Federal Reserve System (the Board) the task of prescribing 'regulations to carry out the purposes' of the Act 'to facilitate compliance therewith' (Sec. 105). The Board attempted to comply by issuing Regulation Z, 12 C.F.R. §§ 226.1 et seq. which regulations were, in effect, instructions to the future contract draftsman of what to do and how to do it. Thus the disclosures had to be made together 'on the same side of the page and above or adjacent to the place for the customer's signature.' Reg.Sec. § 226.8. Items to be disclosed included the amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments, a description of the security interest retained by the creditor, any penalty imposed for prepayment of principal and identification of the method of computing any unearned portion of the finance charge in the event of prepayment.
 
 
 75
 Bearing in mind the essential purpose of the Act and the instructions issued by the Board, I turn to the Contract in issue.
 
 
 76
 The 'Retail Installment Contract', reproduced in reduced form as an 'Appendix' heroto, is a printed document, which details in clear and concise form the financial information which a buyer would need to be informed of his financial obligations. In bold type he is advised of the 'CASH PRICE' of the car he is purchasing--$4,497.65. He sees the amount credited on his 1964 Rambler turn-in--$600. and his cash downpayment--$1,696.65. The 'UNPAID BALANCE OF CASH PRICE' (an important item to him) is a simple arithmetical calculation stated as $2,201.00.
 
 
 77
 Since the buyer was electing to pay this balance over a period of three years, property damage insurance and a finance charge for the installment method of payment would add to the cost. These two charges are also disclosed in bold type, namely, insurance as $259. and the 'FINANCE CHARGE' as $511.80. The 'ANNUAL PERCENTAGE RATE' is stated as 11.08% (this figure was in error but was corrected by notice). These amounts added to the original cost of the car less credits came to $2,971.80 making the total cost to the purchaser (car, insurance and finance charges) $5,268.45, which is stated as 'DEFERRED PAYMENT PRICE'.
 
 
 78
 On the reverse side of the document entitled 'ADDITIONAL TERMS', is a series of paragraphs defining buyer-seller rights 'in the event' that certain contingencies occur. The most important of these paragraphs from the buyer's point of view would be paragraph 6 which deals with the consequences 'In the event the buyer defaults in any payment due hereunder . . .' Under such circumstances 'the seller shall have the right, at his or its election, to declare the unpaid balance, * * * immediately due and payable . . ..' If the seller had cause and chose to exercise this option, it would have the effect of creating a prepayment which would entitle the buyer to the 'PREPAYMENT REBATE' of the FINANCE CHARGE as computed in accordance with the Rule of 78 as specifically set forth in paragraph 13 on the face of the contract.
 
 
 79
 Finally, the buyer's monthly obligations for the ensuing 36 months are clearly disclosed in item '10. PAYMENT SCHEDULE' as 36 payments of $82.55 to commence on August 28, 1971. The 'ANNUAL PERCENTAGE RATE' is stated as '11.08%--subsequently changed by GMAC to '12.83%', which change, as previously stated, did not affect the finance charge or monthly rate.
 
 
 80
 The printed contract form measures some 15 inches in length. The 'ADDITIONAL ITEMS' page on the reverse side is of equal length. Thus, if the entire contract were printed on one side of a paper (and all above the purchaser's signature) it would have been an unwieldy document of some 30 inches in length--not unlike an ancient Egyptian papyrus scroll. Query, whether such a scroll would have been a 'meaningful disclosure' in a 'meaningful sequence'. Rather would it not have brought forth an attack by some astute attorney that it had the opposite effect?
 
 
 81
 The court below, however, came to the conclusion that the 'ADDITIONAL TERMS' on the reverse side, such as the contingencies of default, delinquency, security interest, attorneys' fees and expenses as well as expenses and attorneys' fees on repossession, should have been on the other (or disclosure) side. Accordingly, it found, out of this one transaction, seven separate violations of the various statutes and imposed penalities of $1,000 for each plus the $511.80 finance charge and $615 for an alleged violation of an Illinois statute.
 
 
 82
 My essential disagreement with the conclusions of the court below stems from its findings in substance that items on the reverse side should under the law have been on the opposite side and were in effect 'charges' which had to be disclosed thereon. None of the items were in fact actual 'charges' and at the time of the signing of the Contract could not have been incorporated into the calculation of any figure expressing the financial obligation of the purchasers because they were unknown or contingent and prefaced by 'In the event that . . .'. An example will suffice. If the purchaser failed, to pay, if the seller had to repossess the car, if there were storage and other expenses and if attorneys' fees were incurred in the process, the purchaser would be liable. These highly contingent items--then incapable of ascertainment--could not possibly have been incorporated into any figure entitled a finance charge; yet the court below found that 'Plaintiffs were entitled to disclosure of the total finance charge, including charges for (subsequent and contingent or unknown items) * * $ (Opinion, Conclusions of Law, par. 3 a--g).
 
 
 83
 In a rather recent case, Morris v. First National Bank of Atlanta and Car Circus Company (N.D.Ga.1975) CCH Consumer Credit Guide, P98,568, the court was faced with the claim that the defendants there had failed to disclose the right to accelerate as a delinquency or late charge. The court came to the conclusion that 'disclosures relating to possible additional costs, that are occasioned by a default of the borrower and that cannot with certainty be determined at the time of a credit transaction, are not required by the Act or Reg. Z.' I agree with the court's reasoning. Accordingly the court found that 'no violation of the Act or Reg. Z has been demonstrated by the plaintiffs,' and recommended that the complaint be dismissed. The same judge had come to a similar conclusion in McDaniel v. Fulton National Bank of Atlanta, (N.D.Ga.1974) CCH Consumer Credit Guide, P98,683, finding no violation and dismissing the petition, saying, as can be said here, 'acceleration, in and of itself, does not increase the amount of the debt by one penny.' (p. 88, 264).
 
 
 84
 Even more recently (July 25, 1975) Judge Gurley[2] in a very similar situation but where the motor vehicle had actually been repossessed by the vendor pursuant to a provision authorizing repossession for failure to pay insurance premiums, said, as could be said here, mutatis mutandis: 'The contract executed is very clear in all respects. The date of the contract, the total purchase price of the new car, the cost of the life insurance, the allowances for the old car, the balance due on the old car, the Pennsylvania Sales Tax, the vehicle registration cost, the amount of the finance charge, the unpaid balance, the total payments required, the annual interest percentage rate, and when the payments were to commence are all fully and completely set forth and contained in a most clear and intelligent manner.'
 
 
 85
 The court there concluded that 'all disclosures required by the Act and Regulation Z were properly made to the plaintiffs in the installment sale contract.' Eric Jones, et al. v. East Hills Ford Sales, Inc., et al., 398 F.Supp. 402 (W.D.Pa.1975) (now on appeal). See also Johnson v. McCrackin-Sturman Ford, Inc., 381 F.Supp. 153 (W.D.Pa.1974), reaching a different result.[3]
 
 
 86
 The fundamental purpose of the Act was to protect consumers, but the courts should be mindful of the admonition expressed in Shields v. Valley National Bank of Arizona, 56 F.R.D. 448, 451 (D.Ariz.1971) 'The Act should be strictly enforced by the courts but should not be allowed to be used as means of oppression or harrassument or unjust enrichment.' In addition, the comment by way of footnote by the court in McDaniel, supra, may well be heeded that 'Borrowers are in court re Truth-in-Lending complaints, not arising from failure of borrower to receive or understand critical information with respect to costs and charges incident to the credit transactions, but resulting from mere defense mechanisms, conceived by specializing TIL attorneys to defeat collection of creditors' suits to enforce payment of the underlying debt . . . (N)either the prior abuses against consumers (n)or the present novel arguments of inspired counsel should persuade this Court to decree a violation where the Act and Regulations fail to specify a disclosure requirement.' p. 88, 260.
 
 
 87
 In the case now before us there was no default bringing into being any of the contingencies of the Contract and no claim of lack of understanding of any of the essential financial terms. Nor are the arguments here advanced being used 'to defeat collection of creditors' suits to enforce payment of the underlying debt.' McDaniel, supra. They are being used to foist upon the seller and financing agency penalties for violations which I find to have been nonexistent.
 
 
 88
 Much is made by plaintiffs, the court below and the majority of the alleged error in stating the annual percentage rate. In so doing, plaintiffs are creating windmills at which to tilt. The testimony established that the stated 'ANNUAL PERCENTAGE RATE' was a calculation or conversion rate obtained from the finance charge--not the rate by which the finance charge was calculated. There was no refutation of this fact.
 
 
 89
 Thus Mr. Roark, Credit Manager of GMAC, testified that the finance charge of $511.80 was based on interest at 6.95% and that 'The annual percentage rate is a converted rate on an annual--it's a true interest rate on an annual basis.'; it is the finance charge translated into different terms. If any error were made in the annual percentage rate but not in the finance charge a correction of the rate would not cause any change in the finance charge. (Tr. 86). In other words: 'Q. * * * But the annual percentage rate is a conversion indicating what the 6.95 add-on would be at true interest, is that correct? A. Yes.' As the court itself observed 'the change that you discussed there in no way affected the total amount payable, and that the total amount payable under the contract remained the same as it was when it was first contracted for?' which elicited the answer 'There's no change in the finance charge or the payments or the amount. It has no bearing on it other than the disclosure.' (Tr. 87) 6.95 per cent was the rate in fixing the finance charge, the original disclosed conversion rate was 11.08 and the corrected notice was 12.83. This was only a mathematical conversion error. The finance rate, the payments and the gross amount remained the same (Tr. 87).
 
 
 90
 Plaintiffs' counsel endeavored to assert his own theories of calculation on his own hypotheses. Thus, whereas the witness had said that the finance charge is computed first and then converted to an annual percentage rate, counsel said 'I am doing the reverse' (Tr. 91), and upon this hypothesis claimed that the finance charge would be somewhat less. Counsel pursued his 'reverse' theory at length but the witness adhered to the method actually used, saying: 'You (counsel) are starting with an annual percentage rate. We are starting with a finance charge.' (Tr. 94) and asserted that counsel was 'working backwards.' (Tr. 95). All that emerged from this exchange with the witness by counsel and court was that if some other method of calculation had been used the finance charge might have been some fifty to one hundred dollars lower. But lawsuits should not be decided on such speculative hypotheses. It is difficult to understand the trial court's finding that plaintiffs were entitled to receive a corrected statement (in fact they did receive one) and to an adjustment in the finance charge (none was required because the facts clearly indicated that it remained the same).
 
 
 91
 At most, any error in mathematically computing the conversion rate would fall into a harmless error category. § 1640(b) allows a creditor to avoid liability under the Truth in Lending Act for errors:
 
 
 92
 'A creditor has no liability under this section for any failure to comply with any requirement imposed under this chapter, if within fifteen days after discovering an error, and prior to the institution of an action under this section or the receipt of written notice of the error, the creditor notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a finance charge in excess of the amount or percentage rate actually disclosed.'
 
 
 93
 In this case notice was given and no adjustments were necessary because there was no excess finance charge.
 
 
 94
 Since, to me, it is clear that the difference in the stated annual percentage rate figure did not affect the FINANCE CHARGE, I find it unnecessary to pass upon the 'unintentional error' defense and the post-trial pleading problems presented. However, a review of the record discloses sufficient proof to justify its inclusion as an issue, F.R.Civ.P. 15(b) and the conclusion that it was unintentional.
 
 
 95
 Nor do I find any merit to the suppositious claim that a security interest attached to personal property left in the vehicle.
 
 
 96
 Taking into consideration the purpose of the Truth in Lending legislation and the directions given by the Board in Regulation Z, I am left with the firm conviction that the Contract conformed to the Act and Regulation Z and that the purchasers received the full benefit of the 'informed use of credit' which Congress wished to bestow upon them in clear, conspicuous and meaningful sequence. To adopt plaintiffs' version of how the Contract should have been drawn would lead only to the confusion of the very group of consumers Congress desired to protect.
 
 
 97
 Although agreeing with the majority as to multiple recoveries, I disagree that separate awards should be made to each of the Mirabals. They bought one Buick as husband and wife. As such they were one entity. Payment for the car was a single obligation.
 
 
 98
 I agree with the majority's conclusions as to any liability under the Illinois statutes.
 
 
 99
 In conclusion, I would reverse the judgment of the district court.
 
 APPENDIX
 
 
 *
 Mr. Justice Stevens participated initially as Circuit Judge, and on and after December 19, 1975 as Circuit Justice
 
 
 **
 Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation
 
 
 [1]
 The Mirabals had no direct dealings with GMAC. In its findings of fact the district court found that GMAC arranged for the extension of credit in requiring the dealer to follow GMAC's procedure and forms in approving credit for the Mirabals. However, under the technical meaning of the Act, the dealer 'arranged for the extension of credit' and GMAC extended the credit to the Mirabals. See 15 U.S.C. § 1602(f) explained at 12 C.F.R. § 226.2(f). This latter section reads in part as follows:
 'Arrange for the extension of credit' means to provide or offer to provide consumer credit which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such credit receives or will receive a fee, compensation, or other consideration for such service or has knowledge of the credit terms and participates in the preparation of the contract documents required in connection with the extension of credit.
 The Act, 15 U.S.C. § 1602(f), provides that those who 'regularly extend, or arrange for the extension of, credit' are creditors. Therefore, both GMAC and the dealer are creditors under court made no finding of fact on this issue.
 
 
 [2]
 For instance the amendments were spoken of in this manner in the congressional debates during their consideration. See e.g., 119 Cong.Rec. 25398 (1973) (remarks of Senator Sparkman)
 
 
 [3]
 The plaintiffs in this cation contend that any application of these amendments to actions which have reached final judgment in a trial court is unconstitutional. They support their position by citing a number of cases including McCullough v. Virginia, 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382 (1898) and Hodges v. Snyder, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923). In McCullough, the Court held that the repeal of a statute under which a judgment had been obtained between trial of the action and appeal did not affect the validity of the judgment. It wrote, 'It is not within the power of a legislature to take away rights which have been once vested by a judgment.' 172 U.S. at 123, 19 S.Ct. at 142, 43 L.Ed. at 390. In Hodges the Court refined this position slightly, writing:
 It is true that . . . the private rights of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation, but must be thereafter enforced by the court regardless of such legislation. . . . This rule, however, . . . does not apply to a suit brought for the enforcement of a public right, which, even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced. 261 U.S. at 603, 43 S.Ct. at 436, 67 L.Ed. at 822.
 This distinction, however, although never overruled, does not appear to have current vitality, as the latest restatement of it occurred in the Hodges case.
 The most recent pronouncement on the question appears in Thorpe v. Housing Authority, 393 U.S. 267, 282, 89 S.Ct. 518, 528, 21 L.Ed.2d 474, 484 (1969), where the Court wrote:
 The general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision.
 This, however, does not appear particularly dispositive of our question as it neither overruled the Hodges distinction, nor did the case itself concern a predominantly private judgment. Thus, it is not clear whether the Hodges distinction remains viable law, nor what exactly the Hodges case means by a private judgment.
 
 
 [4]
 The only type judgment not affected by the Portal to Portal Act was a judgment that had been entered before the effective date of the Act and upon which no appeal had been timely taken. See Kemp v. Day & Zimmerman, 239 Iowa 829, 33 N.W.2d 569 (1948)
 
 
 [5]
 However, the Supreme Court never addressed the question of the effect that these actions allowing basically 'private' judgments to be overturned by subsequent legislation had on the Hodges distinction and the inviolability of private judgments
 
 
 [6]
 Although the trial court made a finding that 'the defendants did not make use of proper charts or tables to determine the annual percentage rate,' because they used 'GMAC charts or tables to determine the annual percentage rate . . . rather than Federal Reserve Regulation Z Annual Percentage Rate Tables,' this does not dispose of the issue. By this finding the trial court seems to have indicated that it felt that the only charts and tables properly used were those devised by the Federal Reserve Board. Nothing in the statute or regulations, however, requires a creditor to use any specific charts or tables. Regulation Z, 12 C.F.R. § 226.5(c), provides that any charts and tables can be used so long as they conform to the requirements of the regulation including being devised so that they permit determination of the annual percentage rate to the nearest one-quarter of one percent. No one contends that GMAC's tables were not so devised. Moreover, it is also permissible to use no tables at all, but to independently calculate the rate
 
 
 [7]
 The defendant dealer followed procedures prescribed by the defendant GMAC in complying with the disclosure requirements of the Truth in Lending Act. The trial court found this to be the case in its findings of fact and GMAC does not dispute this on appeal. The dealer, of course, must accept responsibility for these procedures since it was a creditor under the Act and since it performed them. GMAC must also accept responsibility for the procedures since the dealer was acting under its direction in complying with the Act
 
 
 [8]
 The section does not require proof as to exactly what happened with regard to the error in the transaction in question. This, however, does not mean as the defendants seem to suggest that the plaintiffs must prove exactly what happened either. The defendants contended in their reply brief that the 'plaintiffs submitted no evidence . . . that the defendants failed to use proper charts and tables.' They went on to assert that 'no witness identified what particular chart or table was used in preparing the instant Contract.' They blandly concluded by suggesting that the 'plaintiffs . . . had the burden of proof on the issue.'
 Nothing could be further from the truth. The statute, 15 U.S.C. § 1640(c), specifically requires the creditor to show by a preponderance of the evidence that he maintained procedures that were reasonably adapted to avoid errors. This means that the creditor has the burden of proof not only to show that the procedures existed, but also to show that they were in effect and consistently followed during the time in question. It bodes ill for the defendants that they can assert in their brief that '(t)he witnesses were not sure which particular chart was used. But they were sure that some chart had been used.' Certainly, as noted above, the witnesses do not have to testify to or remember the particular events in question. However, they must testify that during the period in which the transaction took place, they always used particular tables, or they always followed certain procedures which included reference to particular tables or particular computations. In other words, if the defendants were to meet this burden of proof, their witnesses should have been able to testify that during the period in question they always followed a certain procedure which included taking the annual rate from a certain chart, and thus that that chart must have been used.
 
 
 [9]
 The defendants point out that on the proper table the correct percentage rate 12.83 percent is just one column above the percentage rate disclosed, 11.08 percent. Thus, they suggest that going across this table to find the correct rate, the slip of only a single line could have resulted in the error
 
 
 [10]
 Statement of Leslie V. Dis, Acting Ex. Dir. of the President's Commission on Consumer Interests, Hearings on S. 5 Before the Subcommittee on Financial Institutions of the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess., 104 (1967). See also Chief Justice Burger's statement to the same effect in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 377, 93 S.Ct. 1652, 1664, 36 L.Ed.2d 318, 334 (1973)
 
 
 [11]
 In Thomas v. Meyers-Dickson Furniture Co., 479 F.2d 740, 748 (5th Cir. 1973), the fifth circuit wrote:
 The result we reach today is consistent with the statute's goal of creating a system of 'private attorney generals' who will be able to aid the effective enforcement of the Act. Section 1640 is intended to allow aggrieved consumers to participate in policing the Act, . . . and its language should be construed liberally in light of its broadly remedial purpose. . . . The domain of consumer credit with its allied commercial practices is no longer in the laissez faire era of caveat emptor. That doctrine is increasingly relegated to its proper place as a historical relic without modern application. The regulatory scheme forcefully expounds an emerging ethic of 'caveat vendor,' and we will not strain to avoid giving effect to the Federal Consumer Credit Protection Act (italics in original).
 
 
 [12]
 Sellers v. Woolman, 510 F.2d 119, 122 (5th Cir. 1975); Eby v. Reb Realty, Inc., 495 F.2d 646, 650 (9th Cir. 1974); Thomas v. Meyers-Dickson Furniture Co., 479 F.2d 740, 748 (5th Cir. 1973); N.C. Freed Co. v. Board of Governors of The Federal Reserve System, 473 F.2d 1210, 1214 (2d Cir. 1973); Gardner & North Roofing and Siding Corp. v. Board of Governors of The Federal Reserve System, 150 U.S.App.D.C. 329, 464 F.2d 838, 841 (1972)
 
 
 [13]
 Clearly, an error could not be made in good faith when no good faith attempt to comply with the statute was made. Thus, when no procedures are set up to provide correct disclosure calculations, or when untrained employees are left to calculate disclosure figures, errors made do not even rise to the level of bona fide errors
 
 
 [14]
 The defendant admits on brief that the error 'would (not) be obvious when it occurred.' Certainly, if this is true, and it is true whenever the rates differ by only small amounts, rechecking is the only way to avoid mistakes. Even the most highly trained person makes mistakes. The only way to catch such mistakes is by rechecking, in some way, the computation. This is not a great burden on a creditor, as checking a chart takes only seconds and doing the computations on an adding machine cannot take more than a minute
 It is clear from this case that rechecking does bring errors to light. GMAC when it received the contract recalculated the annual percentage rate and immediately found the error.
 
 
 [15]
 See footnote 8, supra
 
 
 [16]
 The opinion of Judge Moore suggests that the defendants avoided liability for the incorrect annual percentage rate by correcting it within 15 days of finding the error. Even assuming that the defendants did properly notify the plaintiffs to correct the error, although the plaintiffs deny this and the trial court made no finding of fact on the subject, the defendants still did not meet the requirements of 15 U.S.C. § 1640(b), the section which provides for the exemption. The section reads:
 A creditor has no liability under this section if within fifteen days after discovering an error, and prior to the institution of an action under this section or the receipt of written notice of the error, the creditor notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a finance charge in excess of the amount or percentage rate actually disclosed.
 Judge Moore suggests that because GMAC sent a letter to the obligors regarding the understatement of the rate and stated that the rate should be raised to 12.83 percent to make the contract correct, GMAC has complied with the requirements of the section. Unfortunately, this is not how the section operates. Section 1640(b) lays the burden of an error on the creditors. To comply with the section the creditor must make adjustments in the account so that the obligor pays a finance charge which is neither higher than the amount of the finance charge in the contract, nor higher than the finance charge which would be applicable to the annual percentage rate disclosed in the contract. Thus, if the creditor makes a mistake, he must bear the burden of the mistake and adjust whatever terms necessary downward so that all the terms of the contract correspond.
 This is the plain meaning of the section. Congress did not say that if the creditor 'corrected his error' within 15 days he would avoid liability. Congress told the creditors to make 'whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a finance charge in excess of the amount or percentage rate actually disclosed.'
 In this case, if the creditors had complied with the section, they would have adjusted the finance charge and monthly payments downward a total $69.38 (as determined by the district court) so that the finance charge would correspond with the annual percentage rate actually disclosed of 11.08 percent.
 
 
 [17]
 This particular amendment does not appear to have changed the law with regard to multiple recoveries for multiple errors in the disclosure statement, but only emphasized the fact that multiple recoveries were unwarranted. Certainly, strong policy considerations were present for denying multiple recoveries under the prior law. Primarily, however, the legislative history did not warrant imposition of multiple penalties. The House Report on the Truth in Lending Bill states:
 Any creditor failing to disclose required information would be subject to a civil suit with . . . a maximum penalty not to exceed $1,000 on any individual credit transaction.
 H.R.Rep. No. 1040, 90th Cong., 1st Sess. (1967) (to accompany H.R. 11601), 1968 U.S.Code Cong. & Admin.News, pp. 1962, 1976.
 
 
 [18]
 Accord, Starks v. Orleans Motors, Inc., 372 F.Supp. 928 (E.D.La), affirmed, 500 F.2d 1182 (5th Cir. 1974) (unreported order). However, in a situation where two creditors each made separate and independent disclosure errors in one transaction, the result might be different. We do not face that situation here. Cf. Ljepya v. M.L.S.C. Properties, 353 F.Supp. 886 (N.D.Cal.1973)
 
 
 [19]
 The legislative history appears to run counter to this notion. The House Report to the Act states:
 Any creditor failing to disclose required information would be subject to a civil suit with a penalty equal to twice the finance change, with a minimum penalty of $100 and a maximum penalty not to exceed $1,000 on any individual credit transaction.
 H.R.Rep. No. 1040, 90th Cong., 1st Sess. (1967) (to accompany H.R. 11601), 1968 U.S.Code Cong. & Admin.News, pp. 1962, 1976. However, this passage appears in a general description of the penalty provisions of the bill. It was not directed at determining whether joint obligors could recover separately.
 
 
 [20]
 The court in Rivers v. Southern Discount Company Atlanta II, 4 CCH Consumer Credit Guide P98,796 at 88,450 (N.D.Ga.1973), wrote:
 The Act contemplates, in this Court's opinion, that each borrower is entitled to know the cost of his or her credit prior to signing. Though the Act does require that the creditor furnish only one correct copy of the disclosure statement to one borrower, it is contemplated that all borrowers will be able to view that document if they wish in order to glean the required information. If that one copy is incorrect, as in the case at Bar, then each borrower is deceived and each suffers damage.
 
 
 [21]
 Because this description of subparagraph (b) is set out in the Report under 'Methods of Disclosure' instead of a section on disclosure requirements, the emphasis must be placed on the idea of facilitating compliance by reducing paperwork as opposed to reducing disclosure requirements
 
 
 [22]
 The regulations promulgated by the Department of Financial Institutions of the State of Illinois pursuant to the Illinois Interest Act, Ill.Rev.Stat. ch. 74, § 4b provide in part:
 Sec. 1. Definitions and interpretations. For the purpose of these Rules and Regulations all interpretations, definitions and Rules of Construction as appearing in the various Illinois Statutes and Federal Acts, Regulations and Releases, applicable hereto, shall be followed. Where a specific Rule, interpretation or definition in a particular area as contained in an Illinois Statute or Regulation is inconsistent with that of a comparable Federal Act, Regulation or interpretation, the Federal Act, Regulation or interpretation shall apply and the Illinois Act, Regulation or interpretation shall be disregarded. Where the State Statute, Rule, interpretation or definition is not required by Federal Act or Regulation, the State Statute Rule, interpretation, definition or terminology shall be followed as an additional requirement.
 All Regulations and interpretations presently
 All Regulations and interpretations presently in force and effect and as may hereafter be promulgated by the Board of Governors with regard to the CONSUMER CREDIT PROTECTION ACT, including amendments, modifications and revocations are hereby adopted as the interpretation, Rules and Regulations of this Department to the extent whereby the same are not an assumption of Federal authority.
 For full text of these regulations see 2 CCH Consumer Credit Guide P6621--22 at 20,951 (Illinois).
 
 
 [23]
 Two interpretation letters issued by the Board have made this view clear. In a letter of April 10, 1972, No. 591, the Board wrote:
 (Y)ou questioned whether attorney's fees and other foreclosure costs constitute charges for which disclosures must be made under § 226.8(b)(4) of Regulation Z.
 It is staff's opinion that the thrust of the late payment, delinquency, or default disclosure required under § 226.8(b)(4) relates basically to the types of charges which a creditor may assess automatically, without other conditions, when a late payment, delinquency, or default occurs. However, if the charge is not automatic, but is based on the employment of the services of an attorney to effect collection or consists of other fees and charges payable in conjunction with foreclosure proceedings, such charges would not fall in the normal realm of charges to be disclosed under § 226.8(b)(4). The charges described in your letter appear to be based upon takeing foreclosure action and employing the services of an attorney. Consequently, it would not appear that such charges need to be disclosed under § 226.8(b)(4).
 This excerpt of the letter is printed in the CCH Consumer Credit Guide at P30,834 (transfer binder).
 A similar view was expressed in an earlier letter of March 19, 1970, No. 290, which read in part:
 You further inquire as to whether or not Section 226.8(b)(4) of the Regulation requires the creditor to inform the customer that he may be obligated to pay court costs and attorney's fees in the event a suit is instituted upon default. It has been our position that if the imposition of attorney's fees was automatic, that is, if, for example, 10% attorney's fees become immediately due and collectible by virtue of default, that would constitute a default or delinquency charge which must be disclosed under Section 226.8(b). If, however, the imposition of attorney's fees were not automatic after default, but were conditioned upon employment of the services of an attorney to effect collection, the right to impose such fees under such circumstances did not constitute a default or delinquency charge and, therefore, was not a required disclosure.
 For more complete text see CCH Consumer Credit Guide P30,528 (transfer binder).
 This court, by accepting the Board's interpretation of the statute, does not wish to give its particular approval to such interpretation. However, as the Supreme Court noted in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318, 329 (1973), when commenting upon the Board's rulemaking power under the Truth in Lending Act, 'the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation." The interpretation is not so unlikely that we could say that it is not reasonably related, and so we 'defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority.' Id. at 372, 93 S.Ct. at 1662, 36 L.Ed.2d at 331.
 
 
 [24]
 A further ground for denying recovery under the Illinois Act lies in the fact that the act only requires that disclosure of these charges be made in the contract, not in any special disclosure statement. The charges for attorney's fees, and repossession and sale costs are all included on the back of the contract (i.e., within the contract, but outside the disclosure statement)
 
 
 [1]
 Thus, for example, some courts have held that a disclosure statement must describe contractual provisions for acceleration of principal and recovery of collection costs. See e.g., Woods v. Beneficial Finance Co., 395 F.Supp. 9 (D.C.Or.1975) (Acceleration clause not a 'charge' but should be disclosed in futuro); Meyers v. Clearview Dodge Sales, Inc., 384 F.Supp. 722 (E.D.La.1974); Johnson v. McCrackin-Sturman Ford, Inc., 381 F.Supp. 153 (W.D.Pa.1974) (now on appeal); Garza v. Chicago Health Clubs, Inc., 347 F.Supp. 955 (N.D.Ill.1972); Pollock v. Avco Financial Services, Inc., 4 CCH Consumer Credit Guide P98,766 (N.D.Ga.1974); Pugh v. American Tractor Trailer, Inc., 4 CCH Consumer Credit Guide P98,827 (D.Conn.1974) (semble). Other courts have reached the opposite conclusion. Washington Motor Sales, Inc. v. Ferreira, 329 A.2d 599; CCH Consumer Credit Guide P98,688 (N.J. Essex Co. 1974); cf., Evans v. Household Finance Corp., CCH Consumer Credit Guide P98,678 (S.D.Iowa 1974). In some instances decisions conflict in the same jurisdiction. Compare Jones v. East Hill Ford Sales, Inc., 398 F.Supp. 402 (W.D.Pa.1975) (now on appeal) with Johnson, supra, and compare Hamlet v. Beneficial Finance Co., CCH Consumer Credit Guide P98,646 (N.D.Ga.1974) with Pollock, supra
 
 
 [2]
 Senior District Judge, Western District of Pennsylvania
 
 
 [3]
 Upon appeal, the Court of Appeals for the Third Circuit reversed in a comprehensive opinion filed December 16, 1975