CHICAGO TRANSIT AUTHORITY, a
municipal corporation,
Plaintiff-Appellee,

v.

Brock ADAMS, Secretary of the
Department of Transportation
et al., Defendants-Appellants.

No. 78–2396.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1979.

Decided Nov. 29, 1979.

Rehearing & Rehearing In Banc
Denied Jan. 10, 1980.

Bruce G. Forrest, Dept. of Justice, Civ. Div., Washington, D. C., for defendants-appellants.

Joseph P. Della Maria, Jr., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, TONE and WOOD, Circuit Judges.

SWYGERT, Circuit Judge.

This appeal concerns section 164(b) of the Federal-Aid Highway Act of 1973, 49 U.S.C. § 1602a(b), section 3(g) of the Urban Mass Transportation Act of 1964, *as amended,* 49 U.S.C. § 1602(g), and the regulations promulgated thereunder, 49 C.F.R. § 604 *et seq.*[1] At issue is whether a grantee of the

---

1. Section 164(b) of the Federal-Aid Highway Act of 1973, 49 U.S.C. § 1602a(b), provides:

   No Federal financial assistance shall be provided . . . for the purchase of buses to any applicant for such assistance unless such applicant and the Secretary of Transportation shall have first entered into an agreement that such applicant will not engage in school bus operations, exclusively for the transportation of students and school personnel, in competition with private school bus operators. . . . [T]his subsection shall not apply with respect to any State or local public body or agency thereof if it, (or a direct predecessor in interest from which it

acquired the function of so transporting school children and personnel along with facilities to be used therefor) was so engaged in school bus operations any time during the twelve-month period immediately prior to August 13, 1973. . . .

Section 3(g) of the Urban Mass Transportation Act of 1964, *as amended,* 49 U.S.C. § 1602(g), is similar:

   No Federal financial assistance shall be provided under this chapter for the construction or operation of facilities and equipment for use in providing public mass transportation service to any applicant . . . unless such applicant and the Secretary shall have

Urban Mass Transportation Administration ("UMTA") can provide daily bus service in buses purchased with federal funds for students traveling to their schools of regular attendance from a common departure point at a neighborhood school each morning and back to the neighborhood school for delivery at the end of the school day.

The decision of the chief counsel of UMTA that such bus service constituted impermissible school bus operations by a federal grantee was overturned by the district court on the ground that the UMTA decision violated an agency regulation. We have concluded that the chief counsel's decision was a reasonable interpretation of the statute and regulations and therefore must be reinstated. The decision of the district court is accordingly reversed.

## I.

The services at issue are daily bus transportation of groups of Chicago public school students each morning from a common pick-up point at a neighborhood school to a common delivery point at the school that the children attend and back from the school attended to the neighborhood school delivery point at the end of the school day. These services have been used to transfer students from neighborhood schools to less crowded schools or schools offering special facilities or programs. Recently, they have been used to implement the Chicago Board of Education's voluntary desegregation program.

In June 1974, the Chicago Transit Authority ("CTA") entered into an agreement with UMTA in accordance with the terms of the Urban Mass Transportation Act of 1964, *as amended,* 49 U.S.C. §§ 1601 *et seq.,* whereby the federal agency agreed to provide financial assistance for CTA's purchase of passenger buses, rapid transit cars and related equipment (Project No. IL–03–0040). The grant contract included a provision prohibiting CTA from engaging in school bus operations in competition with private school bus operators, as required by sections 1602a(b) and 1602(g) of Title 49.[2]

Shortly thereafter, in December 1974, the Chicago Board of Education solicited bids from various bus companies for the transportation of students attending Chicago public schools. Bradford School Bus Transit, Inc. ("Bradford") and the CTA were among those bidding to provide these services, which are identical to the kind of services at issue here. The CTA's bid was accepted, and it has been providing bus transportation for Chicago public school children since January 1975.

In December 1976, Bradford and other private school bus operators, including A & D Davenport Transportation, filed a complaint with UMTA against the CTA, alleging that CTA had violated its June 1974 agreement with UMTA by engaging in school bus operations.[3] In his decision, the chief counsel of UMTA concluded that according to UMTA's regulations, the bus service at issue did not constitute school bus operations but was instead permissible inci-

---

first entered into an agreement that such applicant will not engage in schoolbus operations, exclusively for the transportation of students and school personnel, in competition with private schoolbus operators. . . [T]his subsection shall not apply with respect to any State or local public body or agency thereof if it (or a direct predecessor in interest from which it acquired the function of so transporting schoolchildren and personnel along with facilities to be used therefor) was so engaged in schoolbus operations any time during the twelve-month period immediately prior to November 26, 1974. . . . .

2. *Id.*

3. The complaint was filed pursuant to 49 C.F.R. § 605.30 which provides:

Any interested party may file a complaint with the Administrator alleging a violation or violations of terms of an agreement entered into pursuant to § 605.14. A complaint must be in writing, must specify in detail the action claimed to violate the agreement, and must be accompanied by evidence sufficient to enable the Administrator to make preliminary determination as to whether probable cause exists to believe that a violation of the agreement has taken place.

The regulations provide for notification, investigation, adjudication and judicial review. 49 C.F.R. §§ 605.30 *et seq.*

dental charter service.[4] He reached this decision because the disputed services did not involve multiple student pick-ups and deliveries but rather had a common pick-up and delivery point for all students. *A & D Davenport Transportation, et al. v. Chicago Transit Authority,* decided May 5, 1977.

Bradford filed a second complaint with UMTA in April 1977, challenging services provided by CTA which were identical in character to those challenged in the first suit but which involved different contracts and different bus routes. After considering Bradford's complaint and the CTA's response, the chief counsel of UMTA concluded that the *Davenport* case had been decided erroneously and that the disputed services were school bus operations. *Bradford School Bus Transit, Inc. v. Chicago Transit Authority,* decided April 25, 1978. The chief counsel decided that the multiple as opposed to single pick-up and delivery point distinction relied on in *Davenport* did not determine whether services were "school bus operations," and that the regulation was silent on the issue of whether school bus service included anything more than multiple pick-ups and deliveries. After examining the legislative history the chief counsel decided that the disputed services were prohibited school bus operations. The *Bradford* decision made clear that UMTA was reversing its earlier decision and would hereinafter consider the daily use of UMTA funded buses for transportation of groups of students to their schools of regular attendance to be school bus operations.

The CTA had argued that, even if the services were decided to be school bus operations, it was exempt from the prohibition because of the "grandfather" clauses contained in both sections:

> . . . . [T]his subsection shall not apply with respect to any State or local public body or agency thereof if it . . . was so engaged in school bus operations any time during the twelve-month period immediately prior to [the date of enactment].

49 U.S.C. § 1602a(b), 49 U.S.C. § 1602(g). Section 164(b) of the Federal-Aid Highway Act, 49 U.S.C. § 1602a(b), was enacted on August 13, 1973, and section 3(g) of the Urban Mass Transportation Act, 49 U.S.C. § 1602(g), was enacted on November 26, 1974. It was undisputed that the CTA was providing service during both of these periods. However, UMTA decided that even a grantee who was exempted from the school-bus prohibition by the grandfather clauses could not provide school bus service in federally-funded buses. The CTA buses had been purchased with federal funds. CTA was permitted to complete its contract for the 1977–78 school year but was prohibited from performing the services after that time.

CTA responded to the UMTA decision by bringing this action in the United States District Court for the Northern District of Illinois for declaratory and injunctive relief against enforcement. Named as defendants were the Secretary of Transportation and the administrator and chief counsel of UMTA. In an opinion and order dated August 23, 1978, the district court held that the agency's *Bradford* decision was invalid and must be set aside because UMTA's own regulations mandated a finding that the disputed services were charter rather than

---

**4.** The UMTA regulation defining school bus operations provides:

'School bus operations' means transportation by bus exclusively for school students, personnel and equipment in Type I and Type II school vehicles as defined in Safety Program Standard No. 17.

49 C.F.R. § 605.3(b).

"Charter bus operations" are defined as:

. . . . transportation by bus of a group of persons who, pursuant to a common purpose, and under a single contract, at a fixed charge for the vehicles or service, in accordance with the carrier's tariff, have acquired the exclusive use of a bus to travel together under an itinerary either agreed on in advance, or modified after having left the place of origin. (This includes the incidental use of buses for the exclusive transportation of school students, personnel and equipment.)

49 C.F.R. § 604.3(b).

school bus operations.[5] The district court remanded the case to UMTA to determine whether the service was "incidental" as well as "charter," since only "incidental charter service" is permissible.[6] From the decision of the district court, setting aside the opinion of the chief counsel, UMTA brings this appeal.

## II.

### A. School Bus Regulations and the Safety Standard

The regulation defining school bus operations contains a cross-reference to Highway Safety Program Standard No. 17:

**5.** *Id.*

**6.** *Id.*

**7.** Relevant portions of Highway Safety Standard No. 17, 23 C.F.R. § 1204.4 are set out below. Section III contains the "to and from school" language.

PUPIL TRANSPORTATION SAFETY

I. *Scope.* This standard establishes minimum requirements for a State highway safety program for pupil transportation safety; including the identification, operation, and maintenance of school buses; training of personnel; and administration.

II. *Purpose.* The purpose of this standard is to reduce, to the greatest extent possible, the danger of death or injury to schoolchildren while they are being transported to and from school.

III. *Definitions.* "Type I school vehicle" means any motor vehicle with motive power, except a trailer, used to carry more than 16 pupils to and from school. . . .

"Type II school vehicle" means any motor vehicle used to carry 16 or less pupils to or from school. This does not include private motor vehicles used to carry members of the owner's household. . . .

IV. *Requirements.* . . .

. . . . .

B. *Identification and equipment of school vehicles.* . . .

. . . . .

2. Type I school vehicles that are operated by a privately or publicly owned local transit system, and used for regular common carrier transit route service as well as special school route service, shall meet all of the requirements of this standard, except as follows:

a. Such vehicles need not be painted yellow and black as required by paragraphs 1(b) and 1(c) of this section.

. . . transportation by bus exclusively for school students . . . in Type I and Type II school vehicles as defined in Highway Safety Program Standard No. 17.

49 C.F.R. § 605.3(b).

Highway Safety Program Standard No. 17, 23 C.F.R. § 1204.4, promulgated by the National Highway Traffic Safety Administration ("NHTSA"), defines Type I vehicles as "any motor vehicle used to carry more than 16 pupils to and from school," and Type II vehicles as motor vehicles "used to carry 16 or less pupils to or from school." 23 C.F.R. § 1204.4.[7]

b. In lieu of the requirements of paragraph 1(a) of this section, such vehicles shall, while transporting children to and from school, be equipped with temporary signs, located conspicuously on the front and back of the vehicle. The sign on the front shall have the words "School Bus" printed in black letters not less than 6 in. high, on a background of national school bus glossy yellow, as specified in paragraph 1(b) of this section. The sign on the rear shall be at least 10 ft. in size and shall be painted national school bus glossy yellow, as specified in paragraph 1(b) of this section, and have the words "School Bus" printed in black letters not less than 8 in. high. Both the 6-in. and 8-in. letters shall be Series "D" as specified in the Standard Alphabets—Federal Highway Administration, 1966.

. . . . .

C. *Operations.* . . .

. . . . .

2. *Pupil instruction.* At least twice during each school year, each pupil who is transported in a school vehicle shall be instructed in safe riding practices, and participate in emergency evacuation drills.

3. *Vehicle operations.* . . .

. . . . .

d. *Seating.* (1) Seating shall be provided that will permit each occupant to sit in a seat in a plan view lateral location, intended by the manufacturers to provide seating accommodation for a person at least as large as a 5th percentage adult female, as defined in 49 C.F.R. 571.3.

(2) Bus routing and seating plans shall be coordinated so as to eliminate standees when a school vehicle is in motion.

(3) There shall be no auxiliary seating accommodations such as temporary or folding jump seats in school vehicles.

UMTA and the district court disagree about the significance of the cross-referenced safety standard to the decision of this case. According to the district judge, the "to and from school" language in the safety standard is an "operational definition" of school bus operations. He has interpreted "to and from school" to encompass only home to school transportation and not the school to school services disputed here. The trial judge thus concluded that the disputed services were not school bus operations because they were not transportation "to and from school." Safety Standard No. 17, 23 C.F.R. § 1204.4.[8] UMTA, on the other hand, did not consider the "to and from school" language contained in the safety standard in reaching its decision. The agency believed the cross-reference in its regulation defined only the "physical characteristics of school bus vehicles," was not an "operational definition," and was not relevant to the decision of the case.

■ The cross-referenced safety standard "to and from school" language is more restrictive than the language in the school bus operations regulation itself. The regulation, 49 C.F.R. § 605.3(b), defines school bus operations as "transportation by bus exclusively for school students," but that language could include transportation that is not "to and from school" as required by the safety standard, 23 C.F.R. § 1204.4. We therefore conclude that the cross-referenced language in the standard limits the language in the regulation, and the district court was correct to consider the phrase "to and from school" in interpreting the regulation defining school bus operations. However, an analysis of the safety standard

language and its interpretation by NHSTA, which promulgated the standard compels us to disagree with the district court's conclusion. We are persuaded, as UMTA has argued on appeal, that "to and from school" includes the services at issue here.

■ The starting point for understanding the "to and from school" language, as in every case involving construction of a regulation or statute, is the language itself. *Greyhound v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978); *Rucker v. Wabash R. Co.*, 418 F.2d 146 (7th Cir. 1969). Words are to be given their ordinary meaning absent persuasive reasons to the contrary. *Chrobak v. Metropolitan Life Ins. Co.*, 517 F.2d 883 (7th Cir. 1975). The ordinary meaning of "to and from school" in describing vehicles used to transport students would seem to be transportation for purposes of school attendance at the beginning and end of the school day.[9] That meaning would include the services at issue here, since students are taken "to" their schools of regular attendance each morning and "from" their schools of regular attendance each afternoon. We see nothing in the plain meaning of "to and from school" that would exempt these services because there is a common neighborhood departure and delivery point rather than multiple such points.

■ A court only has " 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute.' But it is otherwise 'where no such consequences would follow . . . .' " *Commissioner v.*

---

(4) Drivers of school vehicles equipped with lap belts shall be required to wear them whenever the vehicle is in motion.

(5) Passengers in Type II school vehicles equipped with lap belts shall be required to wear them whenever the vehicle is in motion.

D. *Vehicle maintenance.* Each State shall establish and maintain compliance with the following requirements for vehicle maintenance:

1. School vehicles shall be maintained in safe operating conditions through a systematic preventive maintenance program.

3. School vehicle drivers shall be required to perform daily pretrip inspections of their vehicles, and to report promptly and in writing any defects or deficiencies discovered that may affect the safety of the vehicle's operation or result in its mechanical breakdown. . . .

**8.** *Id.,* section III.

**9.** *Id.,* section III.

*Brown, et al.,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (citations omitted), quoting *Helvering v. Hammel,* 311 U.S. 504, 510–511, 61 S.Ct. 368, 85 L.Ed. 303 (1941). Apparently the trial judge believed that a restricted meaning of "to and from school" was called for by the legislative purpose of the safety standard, which he concluded was "to alleviate the special dangers created by multiple, on the road pick-ups of school children." We cannot agree that the safety requirements contained in the standard were only to protect against the hazards of multiple pick-up and delivery. There is nothing in the standard to indicate such a limited purpose. The purpose stated in the standard is "to reduce, to the greatest extent possible, the danger of death or injury to school children while they are being transported to and from school"; its scope is described as the establishment of "minimum requirements for a state highway safety program for pupil transportation safety, including the identification, operation, and maintenance of schoolbuses; training of personnel; and administration." [10] Such broad language indicates that the standard was designed to be a general safety provision for school bus operations.

Specific provisions of the standard bear out this broader interpretation. Instruction in safe riding practices and drills in emergency evacuation procedures are required twice during each school year.[11] The need for safe riding practices and knowledge of emergency evacuation procedures is as great when students are being transported daily to and from their schools of regular attendance whether there is group or individual pick-up and delivery. Likewise for the seating provision, prescribing the minimum size of bus seats, prohibiting jump seats and requiring students to wear belts under certain conditions.[12] Under vehicle maintenance, the standard requires drivers to perform daily pretrip inspections and report any defects.[13] This safety requirement also bears no relation to whether students embark and disembark singly or as a group.

Although NHTSA, which promulgated the safety standard, has never decided whether "to and from school" includes bus services like those disputed here, it has twice issued statements clarifying the meaning of "to and from school." An analysis of the agency's definition of its own language persuades us that the disputed services are included.

In 1977 the chief counsel of NHTSA stated in a memorandum that "to and from school" included any "trip from a school-related event" since "children are no less deserving of protection when on their way to a football game or a band concert." (Memorandum of NHTSA Acting Chief Counsel, May 5, 1977.) In 1974 NHTSA guidelines had defined "to and from school" as "transportation of school children and school personnel from their homes or the nearest bus stop to their assigned school building for classroom studies and return." NHTSA Notice 900, April 11, 1974.[14]

---

10. *Id.,* sections I and II.

11. *Id.,* section IV C(2).

12. *Id.,* section IV C 3(d).

13. *Id.,* section IV D 3.

14. The 1977 memorandum stated:
    *Some time ago your office asked for our interpretation of the phrase "to and from school," in Highway Safety Program Standard 17, Pupil Transportation Safety. . . . It is my opinion that the interpretation contained in Notice 900 [dated 4/11/74] is excessively narrow, and that the phrase should include any trip for a school related activity. . . . [T]he purpose of Standard No. 17*

is to protect school children and children are no less deserving of protection when on their way to a football game or band concert than when on their way from home to school. NHTSA Memorandum of May 5, 1977.
The 1974 NHTSA notice contains the following language:
    5. What do you mean by 'to and from school?'
    ANSWER: This means for purposes of Standard 17, the transportation of school children and school personnel from their homes or the nearest bus stop to their assigned school building for classroom studies and return.
NHTSA Notice 900, issued April 11, 1974.

The UMTA regulation defining school bus operations, which incorporates by cross-reference the "to and from school" language contained in the safety standard, was issued in March, 1976, after the April 1974 NHTSA interpretation but prior to the 1977 agency revision.[15]

It is clear that the services at issue here fit the 1974 notice language of "transportation . . . to [an] assigned school building for classroom studies and return." (NHTSA Notice 900, April 11, 1974.)[16] Further, because the neighborhood school is used not for classroom attendance but merely as a location for pick-up and delivery for students traveling to their attendance schools, the neighborhood school is the "nearest bus stop" specified in the 1974 NHTSA notice.[17]

The plain meaning of "to and from school" includes the disputed services. Further we have concluded, in contrast to the trial judge, that the ordinary meaning supports rather than thwarts the purpose of the safety standard. Finally, the agency's clarification of the relevant language indicates that "to and from school" includes these services. Therefore we cannot agree with the district court that the agency decision violated the school bus operations regulations because the services were not "to and from school."

**B. *The Charter Bus Operations Regulation***

■ The disputed services are "transported by bus exclusively for school students" in vehicles used to carry students "to and from school," the language of the

UMTA regulation defining school bus operations.[18] However, another UMTA regulation permits charter bus operations and defines charter operations to include "the incidental use of buses for the exclusive transportation of school students."[19] Because some "exclusive transportation of school students" is charter bus operations, it is clear that not all "transportation by bus exclusively for school students" is school bus operations. According to the trial judge, the services at issue here are charter rather than school bus operations. We reach the opposite conclusion.

Charter bus operations are defined in the UMTA regulations as:

> transportation by bus of a group of persons who, pursuant to a common purpose, and under a single contract, at a fixed charge for the vehicles of service, in accordance with the carrier's tariff, have acquired the exclusive use of a bus to travel together under an itinerary, either agreed on in advance or modified after having left the place of origin. (This includes the incidental use of buses for the exclusive transportation of school students, personnel and equipment.)

49 C.F.R. § 604.3.

We do not believe that the daily transportation of students to and from their schools of regular attendance was intended to be charter bus service under the regulation. Although there is nothing in the language of the charter bus service regulation that would exempt the disputed services, the same can be said for the language in the regulation defining school bus operations.[20]

15. *See* note 4, *supra*, where the school bus operations regulation is set out.

16. *See* note 14, *supra*.

17. *Id.*

18. *See* notes 4 and 7, *supra*. Although the regulation refers to the use of Type I and Type II school vehicles specified in Highway Safety Program Standard No. 17, 23 C.F.R. § 1204.4, the standard authorizes the use of standard buses made for use in common carrier transit route service provided that the buses are marked as specified in the regulation. *See* n.7, *supra*, paragraph IV B.2. The CTA was using buses so marked.

19. *See* note 4, *supra*.

20. As we read the regulation, the parenthetical sentence, which specifies when services involving transportation of students are included, assumes that such services first meet the requirements of the nonparenthetical portions of the regulation. It is a technical reading of the nonparenthetical portion that we refer to as not exempting the disputed services. Because we ultimately conclude that the disputed services do not fit within the nonparenthetical language of the regulation, we do not reach the issue of "incidental use" raised in the parenthetical sentence.

Since the transportation here is daily service to and from school at the beginning and end of the school day, it is indistinguishable from undisputed school bus operations except for the common point of pick-up and delivery. Although that distinction permits the services to fit technically within the "charter bus operation" language, we believe that the language of the charter regulation describes a single trip or series of trips for school students rather than daily transportation at the beginning and end of each school day when it speaks of groups traveling under a "single contract" and "under an itinerary, either agreed on in advance or modified after having left the place of origin."[21] The school bus operations regulation, on the other hand, speaks of transportation "to and from school," language which we have concluded describes the daily transportation of students to and from their schools of regular attendance at the beginning and end of the school day. Therefore these services better fit the ordinary meaning of the language of the school bus operations regulation.

Further, we agree with UMTA that the legislative history establishes that the disputed services are school bus rather than charter bus operations. It is undisputed that the purpose of the school bus provision was to prevent competition with private school bus operators, competition perceived by Congress to be unfair. House Conf. Rept.No. 93–410 at 87 (1973); Sen.Conf. Rept.No. 93–355 at 87 (1973), U.S.Code Cong. & Admin.News 1973, p. 1859. The original House proposal for what would become section 164(b) of the Federal-Aid Highway Act of 1973, 49 U.S.C. § 1602a(b), would have prohibited a recipient of federal aid from providing transportation for students "to and from school and *school authorized functions.*" S. 502, 93rd Cong., 1st Sess., § 123 (emphasis added).[22] During debate on the House bill, an amendment to the Urban Mass Transportation Act, 49 U.S.C. § 1601 *et seq.*, was proposed which also prohibited grantees from transporting students "to and from school and *school authorized functions.*" 119 Cong.Rec. 13266 (1973) (remarks of Congressman Wright) (emphasis added).[23] In conference, the language was changed to that enacted in both statutes, prohibiting "school bus operations in competition with private school bus operators."[24] The final language was explained by the chairman of the House Transportation Subcommittee who was also a House Conferee as not precluding "*individual charter-type trips*" by UMTA grantees. 119 Cong.Rec. 28102 (1973) (remarks of Congressman Kluczynski) emphasis added).[25]

---

21. *See* note 4, *supra.*

22. The House bill would have prohibited financial assistance to
   "any State or local public body or agency thereof which engages directly or indirectly in the transporting of school children and school personnel to and from school and school-authorized functions in competition with or supplementary to the service currently provided by a private transportation company or other person engaged in so transporting such children and personnel." S. 502, 93rd Cong. 1st Sess., § 123.

23. The Amendment, which was offered by Congressman Wright, provided:
   "No financial assistance shall be provided under this Act to any State or local public body or agency there of which engages directly or indirectly in the transporting of school children and school personnel to and from school and school-authorized functions or which proposes to expand present route schedules, service or facilities for the purpose of providing transportation for schoolchildren and school personnel to and from school and school-authorized functions in competition with or supplementary to the service currently provided by a private transportation company, or other person, engaged in so transporting such children and personnel." 119 Cong.Rec. 13266, April 19, 1973.

24. *See* note 1, *supra.*

25. Congressman's Kluczynski's remarks were as follows:
   ". . . [E]ither a school bus, if operated by a public body, or a public mass transit bus can be used on individual charter-type trips to transport school-children to various points of interest within the actual geographic area serviced by the school bus operation or the city mass transit bus operation." 119 Cong. Rec. 28102 (1973).

The conference version was a compromise because even individual trips would have been forbidden by the House proposals precluding transportation for school authorized functions.

■ After examining the legislative record, we are persuaded that Congress intended to bar federal grantees from competing with private operators in daily bus transportation to and from the students' school of regular attendance, while at the same time permitting grantees to transport students on school trips. Therefore, we agree with UMTA that the disputed services are school rather than charter bus operations.

### C. Grandfather Clauses and Federally-Funded Buses

The CTA argues that even if we decide that the services are school bus operations, the CTA is exempted from the school bus prohibition by the "grandfather" clauses in both section 146(b) of the Federal-Aid Highway Act of 1973, 49 U.S.C. § 1602a(b), and Section 3(g) of the Urban Mass Transportation Act of 1964, *as amended*, 49 U.S.C. § 1602(g). The clause in the Federal-Aid Highway Act reads:

. . . [T]his subsection shall not apply with respect to any state or local public body or agency thereof if it (or a direct predecessor in interest from which it acquired the function of so transporting school children and personnel along with facilities to be used therefor) was so engaged in school bus operations any time during the twelve-month period immediately prior to August 13, 1973.

49 U.S.C. § 1602(g).

Section 3(g) of the Urban Mass Transportation Act contains the identical language except that the exempted period is the twelve months immediately prior to November 24, 1974.[26] It is undisputed that

CTA provided service during both twelve-month periods.

As UMTA reads the statutes, the CTA—although a "grandfathered" grantee and therefore otherwise exempt—cannot engage in school bus operations using federally-funded buses. CTA concedes that its buses were purchased with federal aid, but argues that UMTA's interpretation of the clauses to prohibit the use of federally-funded buses is erroneous.

According to UMTA the plain language of the grandfather clauses exempts only a "state or local public body or agency thereof" and not the facilities it uses.[27] As UMTA reads the statutes, CTA is exempted because they performed the services during the twelve-month period prior to the statutory enactments, and CTA can continue to perform these services in buses not purchased with federal funds. UMTA would permit federally funded buses to be used by a grandfathered grantee only in the one situation where "facilities" are specifically mentioned in the clauses:

[T]his subsection shall not apply . . . to any state or local public body or agency thereof if it (or a direct predecessor in interest from which it acquired the function of so transporting school children and personnel along with *facilities* to be used therefore) . . . . .

49 U.S.C. § 1602a(b), 49 U.S.C. § 1602(g) (emphasis added).

Federally-funded buses would be exempted only where they have been acquired from a direct predecessor in interest who engaged in school bus operations during the grandfather period.

In support of its interpretation, UMTA points to a provision of the Urban Mass Transportation Act of 1964, *as amended*, which states that UMTA grants can only be made for facilities that will be used in mass transportation. 49 U.S.C. § 1602(a)(1).[28]

---

26. *See* note 1, *supra*.

27. *Id.*

28. The Secretary is authorized, . . . to make grants or loans . . . to assist

States and local public bodies and agencies thereof in financing (1) the acquisition, construction, reconstruction, and improvement of facilities and equipment for use, by operation or lease or otherwise, in mass transpor-

Mass transportation is specifically defined elsewhere in the statute to exclude school buses.[29] Thus UMTA concludes that federally-funded buses cannot be used for school bus operations unless the buses themselves are specifically exempted.

■ UMTA's interpretation of the statute to forbid school bus operations in federally-funded buses has been codified in an UMTA regulation:

> No grantee or operator of project equipment shall engage in school bus operations using buses, facilities or equipment funded under the [Federal-Aid Highway or Urban Mass Transportation] Acts.
> . . .

49 C.F.R. § 605.12.

In the preamble to its school bus regulations, UMTA states:

> Greater emphasis is placed in the current version on the fact that federally-assisted buses, facilities, and equipment may not be used for the exclusive transportation of school students, personnel or equipment. Even if a federally-assisted operator is allowed to engage in school bus operations under one of the exemptions listed in sections 3(g) and 164(b), the operator cannot use federally-assisted buses, facilities and equipment in those operations.

49 C.F.R. § 605 (preamble).

The validity of a regulation promulgated under statutory authority will be sustained so long as it is "reasonably related to the statutory purpose." *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 280–281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969); *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Mirabal v. General Motors Acceptance Corp.*, 537 F.2d 871, 885, n.23 (7th Cir. 1976). Therefore if we find the UMTA regulation prohibiting the use of federally-funded buses in school bus operations to be reasonably related to the purpose of the statutes, we must sustain the UMTA regulation. The declared purpose of the Urban Mass Transportation Act is to improve mass transportation.[30] The Act requires that grants be given only for the purchase of buses to be used in mass transportation. 49 U.S.C. § 1602(a)(1).[31] As we point out below, UMTA has interpreted the Acts to prohibit federally-funded buses in school bus operations so as to preserve these buses for use in mass transportation.

In order to understand UMTA's reasoning, it is helpful to reconsider the regulation defining charter bus operations.[32] Even permissible charter bus operations for school students are restricted to "incidental use."[33] When buses are transporting students in incidental charter service, federally-funded buses may be used:

> No grantee or operator of project equipment shall engage in school bus operations using buses, facilities or equipment funded under the Acts. A grantee or operator may, however, use such buses, facilities and equipment for the transpor-

---

tation service in urban areas and in coordinating such service with highway and other transportation in such areas, and (2) the establishment and organization of public or quasi-public transit corridor development corporations or entities. . . .
    49 U.S.C. § 1602(a)(1).

29. "[T]he term 'mass transportation' means transportation by bus, rail, or other conveyance, either publicly or privately owned, which provides to the public general or special service (*but not including school buses* or charter or sightseeing service) on a regular and continuing basis."
    49 U.S.C. § 1608(c)(5) (emphasis added).

30. "The purposes of this chapter are—
    (1) to assist in the development of improved mass transportation . . . .
    (2) to encourage the planning and establishment of areawide urban mass transportation systems . . . . .
    (3) to provide assistance to State and local governments and their instrumentalities in financing such systems . . . .."
    49 U.S.C. § 1601(b).

31. *See* note 28, *supra*.

32. *See* note 4, *supra*.

33. *Id.*

tation of school students, personnel and equipment in incidental charter bus operations . . . .

49 C.F.R. § 605.12.

The word "incidental" has been defined in the regulations:

'Incidental' means charter bus operations during off-peak hours which does not interfere with regularly scheduled service to the public. . . .

49 C.F.R. § 605.3(b).

Although UMTA permits the use of federally-funded buses in incidental charter service, the statutory purpose has been preserved because the charter service is limited to non-peak hours when the federally-funded buses are least likely to be needed for mass transportation. The use of federally-funded buses for school bus operations, on the other hand, would as a rule not retain the buses for their intended use in mass transportation.

"Incidental use of federally-assisted buses is a use which does not interfere with regularly scheduled mass transportation service to the public. By nature of their definitions, the terms 'school bus operations' and 'incidental use' are mutually exclusive as defined in these final regulations. Since school bus operations are usually undertaken in peak morning and evening hours, the incidental use of federally-assisted buses during these times is not possible."

49 C.F.R. § 605 (preamble).

■ UMTA's regulation prohibiting the use of federally-funded buses in school bus operations is consistent with the statutory purpose of preserving buses purchased with UMTA funds for use in mass transportation. Because the regulation prohibiting the use of federally-funded buses in school bus operations is "reasonably related to the statutory purpose," it is valid. *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 280–281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969); *Mourning v. Family*

*Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Mirabal v. General Motors Acceptance Corp.*, 537 F.2d 871, n.23 (7th Cir. 1976). Accordingly, though CTA falls within the statutory exemption because it was providing service during the two twelve-month "grandfather" periods, it cannot provide school bus service in its federally-funded buses.

We are persuaded that UMTA has not violated the statute or its own regulations. Moreover, we do not find any of UMTA's relevant regulations to be invalid.

The judgment of the district court is reversed.