11 Mass. App. Ct. 551 551

Plymouth Cty. Bus Transp., Inc. *v.* Greater New Bedford Regional Tech. High School.

PLYMOUTH COUNTY BUS TRANSPORTATION, INC. & others[1] *vs.* GREATER NEW BEDFORD REGIONAL VOCATIONAL TECHNICAL HIGH SCHOOL COMMITTEE & others.[2]

Bristol. January 13, 1981. — March 11, 1981.

Present: ARMSTRONG, ROSE, & GREANEY, JJ.

*School and School Committee,* Transportation of students, Contract. *Statute,* Construction.

A regional school district committee's plan to transport large numbers of students to and from its high school by means of public transportation did not violate that portion of G. L. c. 71, § 7C, which denies financial assistance to public carriers who engage in school bus operations, exclusively for the transportation of students, where the public carrier did not establish routes for the purpose of carrying students to the exclusion of others but merely added buses from its existing stock to its regular routes and did not deny access to nonstudent passengers. [556-561]

The competitive bidding requirements of G. L. c. 71, § 7A, are limited to contracts framed thereunder and did not, therefore, apply as a condition precedent to a regional school district committee's obtaining reimbursement under § 7B for the cost of transporting its students to and from school by means of public transportation. [561-562]

CIVIL ACTION commenced in the Superior Court on August 31, 1977.

[1] The other plaintiffs are the United Truck and Bus Service Co., Town and Country Transportation and Leasing Corp., and the School Bus Contractors Association of Massachusetts and its executive director. These parties are all concerned with private contracts for school bus transportation.

[2] The additional defendants are the school committee's members, Union Street Railway Company and its president, the members of the advisory board of Southeastern Regional Transit Authority, and its administrator, the Commissioner of Education, the Secretary of the Executive Office of Transportation and Construction, and the State Treasurer.

The case was heard by *Sahady*, J., a District Court judge sitting under statutory authority.

*Martin Ames* for the plaintiffs.

*J. Louis LeBlanc* for Greater New Bedford Regional Vocational Technical High School Committee.

*Manuel Kyriakakis* for Southeastern Regional Transit Authority.

*Thomas F. Burke* for the Union Street Railway Company & another.

*Carl Valvo*, Assistant Attorney General, for Commissioner of Education & others.

GREANEY, J.  At issue in this case is the validity of a regional school district committee's plan to transport large numbers of students to and from its high school by means of public transportation.  The plaintiffs claim that the transportation plan violates G. L. c. 71, §§ 7A and 7C.  We hold that the plan conforms to statutory requirements.

The plaintiffs brought this action in 1977 to challenge a decision by the Greater New Bedford Regional Vocational Technical High School Committee[3] (committee) to use public rather than private bus services to transport approximately 1,000 New Bedford students to the regional district's new high school.  The public bus service was supplied by the Southeastern Regional Transit Authority (SERTA) — a regional transportation authority operating pursuant to G. L. c. 161B[4] — through its agent, the Union Street Railway Company (Union Street).  The plaintiffs sought a declaration that the transportation plan violated G. L. c. 71,

---

[3] The Greater New Bedford Regional Vocational Technical High School District was formed on February 25, 1972, in accordance with G. L. c. 71, §§ 14-14D, and 15-16F, and is comprised of the city of New Bedford and the towns of Fairhaven and Dartmouth.  The agreement creating the district specified that it would provide school transportation to the new regional high school, as required by G. L. c. 71, §§ 14B and 16C.

[4] SERTA services the cities of New Bedford and Fall River, and the towns of Westport, Acushnet, Dartmouth, Fairhaven, Freetown, Somerset and Swansea.  See the second paragraph of G. L. c. 161B, § 2.  The transportation plan in this case concerned only students living in New Bedford.

11 Mass. App. Ct. 551                                      553

Plymouth Cty. Bus Transp., Inc. v. Greater New Bedford Regional Tech. High School.

§§ 7A[5] and 7C.[6]  They also sought injunctions to stop the plan from taking effect and to prevent the various State de-

_____

[5] In pertinent part, G. L. c. 71, § 7A, as amended through St. 1976, c. 286, § 1, reads as follows:

> "The state treasurer shall annually, on or before November twentieth, pay to the several towns subject to appropriation, the sums required as reimbursement for expenses approved by the commissioner of education, incurred by any town for the transportation of pupils once daily to and from any school within the town, or in another town, in excess of five dollars per annum per pupil in the net average membership of such town; provided, (a) that no transportation reimbursement shall be made on account of any pupil who resides less than one and one half miles from the school which he attends, measured by a commonly travelled route; (b) that the amount of grant, per pupil, for transportation to private schools in towns which furnish such transportation, shall not exceed the amount of grant per pupil for transportation to public schools and (c) that no contract shall be awarded except upon the basis of prevailing wages rates, as hereinafter provided and of sealed bids, and the school committee shall, in the event that a contract is awarded to other than the lowest bidder, file with the department a written statement giving its reasons therefor, which statement shall be open to the public inspection.  No expense incurred by a town for the transportation of pupils shall be approved by the commissioner for the purpose of such reimbursement, if it appears to him, after diligent inquiry, that such expense has been incurred for transportation for which reimbursement is not authorized hereunder or has been incurred pursuant to any contract awarded in violation of any provision of this section or of section four of chapter forty.  The department shall advise and assist the school committees of the several towns relative to the transportation of pupils at the lowest cost commensurate with their safety, including the planning of routes and the selection and use of equipment."

[6] In pertinent part, G. L. c. 71, § 7C, inserted by St. 1976, c. 518, § 1, reads as follows:

> "No financial assistance shall be provided by the commonwealth for the purchase of buses or the operation thereof to any applicant for such assistance unless such applicant and the secretary of transportation and construction shall have first entered into an agreement that such applicant will not engage in school bus operations, exclusively for the transportation of students and school personnel, in competition with private school bus operators."

The laws pertaining to reimbursement for school transportation are made applicable to regional school districts by G. L. c. 71, § 16C.

fendants from approving it or assisting SERTA financially. After a seventeen-day trial, a judge sitting in the Superior Court entered a memorandum of decision which held substantially in the defendants' favor. A judgment was subsequently entered which denied the requested injunctive relief and which declared, in essence, that the committee's actions complied in all respects with the requirements of the pertinent statutes.

The facts, taken principally from the judge's findings, may be summarized as follows. Some time prior to the fall of 1977, the committee began to discuss the transportation needs of the students who would attend the new regional high school opening that September. These discussions included the merits of using public as opposed to privately-contracted transportation for the students. In July, 1977, the committee solicited bids from private carriers for the transportation contract. In the bid invitation and the accompanying specifications, the committee reserved the right "to reject any or all bids or any part thereof."

Before the bid deadline, the committee received sealed bids from four private contractors and a proposal from Union Street on behalf of SERTA. Union Street's letter indicated that over ninety-five per cent of the New Bedford students lived within 1,500 feet of the existing SERTA bus route which directly or indirectly serviced the school. By adding buses on some routes and making minor modifications on others, SERTA buses could carry almost all of the students who needed transportation. It was proposed that the committee make bulk purchases of books containing "10-ride school tickets" which would be distributed to the students. Each ticket would be good for one zone of travel at the usual one-half student fare. A student would board a regular SERTA bus at the stop nearest his home and would use one or two tickets, depending on the distance (zones) from the bus stop to the school, in the same manner as regular passengers who were taking the bus. The proposal

did not comply with at least five of the committee's published specifications.[7]

After hearing representatives of the private carriers and Union Street, the committee voted on August 7, 1977, four to two, to award the transportation contract to one of the private bidders. Because of a rule that a majority of five votes was necessary to pass any matter before the committee, the motion was declared defeated. On August 9, 1977, the committee voted, five to three, to accept Union Street's proposal, to reject all the private bids, and to readvertise for new bids for the transportation of those students living in Fairhaven and Dartmouth as well as certain outlying sections of New Bedford who could not be accommodated on SERTA's routes. Transportation for these students was eventually arranged with one of the private companies. At the time of its votes, the committee had information from which it could find that the district would save money by using public transportation.

In September, 1977, the plan went into effect. Union Street added eleven buses from its existing stock to service certain routes. All the carriers traveled along regular public bus routes to the high school. In order to meet demand at peak times, the interval between buses on some of the routes was reduced from fifteen to ten minutes. In the afternoon, eleven buses were released from SERTA's garage and traveled directly to the high school with "out of service" signs on their rollers. These buses picked up the students at 2:30 P.M. and then proceeded to pick up and dispatch passengers along established routes within the city. There was evidence

_____

[7] Union Street could not comply with specifications 2 and 8 which required that buses used be sixty-five passenger vehicles registered as school buses, that the buses have certain numbers painted on each side and on the rear of the conveyance, and that the vehicles be lettered on both sides with the words "Greater New Bedford Regional Vocational." SERTA's buses are of the type commonly used by street transportation companies. Union Street also apparently did not comply with specification 6 regarding liability insurance or specification 16 pertaining to prevailing wage rates to operators of motor buses. Nor was a bid deposit made as required by specification 19.

that nonstudent passengers were not denied access to the buses (although at peak times the majority of the passengers were students), that the buses were not modified in any respect to carry the students,[8] and that the arrangements made were consistent with measures usually taken by SERTA to meet community needs.[9]

1. We first address the plaintiffs' contention that the transportation plan is illegal because it violates that portion of G. L. c. 71, § 7C (see note 6, *supra*) which denies financial assistance to public carriers who violate or breach a prescribed agreement by engaging in school bus operations, exclusively for the transportation of students. The plaintiffs argue that this statute was designed to promote free enterprise by keeping public transportation systems completely out of this market. These arguments overlook the existence of G. L. c. 71, § 7B, as amended through St. 1978, c. 514, § 188,[10] the interrelation between §§ 7A, 7B, and 7C, and the judge's findings on the crucial issue whether this plan

---

[8] On some buses, small cardboard signs were placed to identify the bus for the students.

[9] There was evidence that SERTA added extra buses to different routes from time to time to meet increased demand, and that its buses entered private property such as shopping malls, high-rise apartment complexes, and school grounds to pick up passengers. SERTA's timetables indicated that the transportation of the regional high school students was just one of many public bus services provided by the authority.

[10] In pertinent part, this statute reads as follows:

"To provide for the reimbursement of part of the cost not reimbursable under section seven A incurred directly by a school department or indirectly by a city or town on account of an assessment made to meet the cost of maintaining a public transportation of pupils in a city or town using public transportation facilities . . . operated under the provisions of chapter one hundred and sixty-one B, for the transporting of pupils to and from school who reside more than one and one half miles from the school they attend as determined by the commissioner . . . .

"Funds received by each city or town shall be used to pay the cost of providing public transportation or to reimburse a city or town for payments on account of any assessment made upon it to meet the cost of maintaining a public transportation system, provided that notwithstanding the provisions of this section, no amount shall be approved as a reimbursement by the commissioner as herein provided in excess of the amount to be paid by such city or town for said public transportation."

amounts to "school bus operations, exclusively for the transportation of students."

Since 1947, G. L. c. 71, § 7A, has set forth the conditions and mechanisms for reimbursement of the costs spent by municipalities on contracts for the mandatory transportation of students to schools. See Rep. A.G. , Pub. Doc. No. 12, at 120 (1965); 1965 Ann. Survey Mass. Law § 20.24, at 318. Beginning in 1961, unsuccessful legislative efforts were made to obtain additional reimbursement to municipalities for a greater portion of pupil transportation costs. See, e.g., 1962 Senate Doc. No. 899; 1964 Senate Doc. No. 806. In April, 1964, the Governor filed a special message with the Legislature with respect to the Commonwealth's transportation problems. Out of this message came 1964 Senate Doc. No. 925, which was engrossed and enacted on June 17, 1964, as St. 1964, c. 563.[11] Section 8 of this chapter created § 7B of c. 71, to reimburse municipalities for direct[12] or indirect[13] costs, not otherwise reimbursable under § 7A, incurred in connection with pupil transportation by bus companies (licensed under G. L. c. 159A, §§ 1 and 7) or by the Massachusetts Bay Transportation Authority (under G. L. c. 161A). In 1973, § 7B was amended (St. 1973, c. 1141, § 5) to authorize reimbursement for transportation costs arising out of the use of regional transportation authorities established under G. L. c. 161B. Sections 7A and 7B provide special subsidies within the framework of the education law (see Rep. A.G., *supra* at 121) to assist municipalities

---

[11] This chapter reorganized the MTA into the MBTA and provided for the acquisition and maintenance of mass transportation facilities which could be coordinated with highway systems and urban development plans throughout the Commonwealth.

[12] These would be expenses generated by payments made directly by school departments to a public transportation authority for pupil transportation.

[13] These would contemplate reimbursement for part of the payment by a municipality of an assessment made to meet its share of the cost of maintaining a public transportation system.

in achieving the goal (stated in § 7A) of "transport[ing] . . . pupils at the lowest cost commensurate with their safety."

Section 7C — taken from a section of the 1973 Federal-Aid Highway Act[14] — was added to the statutory scheme in 1976. This statute is intended to protect the legitimate economic expectations of private school bus operators. It seeks as well to insure that public transportation companies will not forsake their basic priority of providing economical transportation for people living in urban areas for potentially more lucrative school bus contracts.

These three statutes must be construed in light of the foregoing legislative history and their respective objectives (*Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 [1975], and cases cited) under the settled principle that "[s]ections of the same chapter are to be interpreted, if reasonably practicable, so as to constitute an harmonious and consistent body of laws." *Gosselin* v. *Gosselin*, 1 Mass. App. Ct. 146, 148 (1973), citing *Kelley* v. *Jordan Marsh Co.*, 278 Mass. 101, 111 (1932). See *Morse* v. *Boston*, 253 Mass. 247, 252 (1925); *McCue* v. *Director of Civil Serv.*, 325 Mass. 605, 611 (1950). We do not view § 7C as an attempt to nullify the ability of a municipality to obtain maximum reimbursement by making the most efficient use of available private and public facilities to transport its students. Rather, § 7C bars public carriers (under threat of loss of certain financial assistance) from "engag[ing] in school bus operations, exclusively for the transportation of students . . . ." This restriction on public carriers indirectly limits a municipality in its choice of resources for pupil transportation.

---

[14] In pertinent part, 49 U.S.C. § 1602a(b) (1973) reads as follows:

"No Federal financial assistance shall be provided . . . for the purchase of buses to any applicant for such assistance unless such applicant and the Secretary of Transportation shall have first entered into an agreement that such applicant will not engage in school bus operations, exclusively for the transportation of students and school personnel, in competition with private school bus operators."

In this statutory context, the trial judge ruled that he was "unable to find that SERTA engaged in the transportation of students on routes especially established for the purpose of carrying students to the exclusion of others."[15]  He apparently accepted the evidence that, within the transportation industry, "school bus operations" involve "transportation by bus exclusively for school students . . . using [certain specific types of] school vehicles as defined in the Highway Safety Program . . ." (49 C.F.R. § 605.3 [1976]), and he apparently construed the critical word "exclusively" in accordance with its approved usage (G. L. c. 4, § 6, Third; *Moy* v. *Jack Madden Ford Sales, Inc.*, 4 Mass. App. Ct. 102, 105 [1976]) to mean "in an exclusive manner," Webster's Third New Intl. Dictionary 793 (1976);[16] Black's Law Dictionary 506, 507 (5th ed. 1979).  See *Chatham Corp.* v. *State Tax Commn.*, 362 Mass. 216, 219 (1972). We believe, with respect to school bus operations, that the word "exclusively," as used in § 7C, denotes service which limits ridership only to student passengers on special routes under a closed door policy.  The question whether the plan in this case amounted to exclusive school bus operations thus became one of fact for the judge to resolve under the relevant legal principles just discussed.  The plaintiffs have not shown that the judge misconceived or misapplied these prin-

---

[15] In reaching this conclusion and in construing the statutes, the judge properly rejected the plaintiffs' offer of testimony from two members of the General Court involved with the enactment of § 7C and a citizen who was in attendance at legislative hearings on the bill which became § 7C. This testimony was offered to show the meaning of and "intention behind the statute."  It is established that postenactment testimony of an individual legislator is inadmissible to show the Legislature's intent in enacting a statute or the meaning of the language used therein. *Browne* v. *Turner*, 174 Mass. 150, 159 (1899). *Selectmen of Natick* v. *Boston & Albany R.R.*, 210 Mass. 229, 232 (1911). *Plunkett* v. *Old Colony Trust Co.*, 233 Mass. 471, 474 (1919). *McKenney* v. *Commission on Judicial Conduct*, 377 Mass. 790, 800 n.9 (1979).

[16] This dictionary defines the word "exclusive" as "excluding or having power to exclude (as by preventing entrance or debarring from possession, participation, or use)."

560                                11 Mass. App. Ct. 551

Plymouth Cty. Bus Transp., Inc. v. Greater New Bedford Regional Tech. High School.

ciples or that his findings on the determinative issue of exclusivity were clearly erroneous.[17]   Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160-161 (1977), Smith & Zobel, Rules Practice § 52.7 (1977).[18]   The conclusion

---

[17] The evidence warranted each of the findings set forth in the statement of facts.   There was evidence as well from an assistant secretary of the Commonwealth's Office of Transportation and Construction (the office which enforces § 7C and which bears general responsibility under C. L. c. 161B for the operations of regional transit authorities) that the plan in this case did not constitute exclusive service and that it was consistent with the office's policy of promoting the use of public transit systems for school transportation.   See generally G. L. c. 161B, § 8(*a*). Evidence of the application and interpretation of statutes by the agency charged with their enforcement is entitled to some weight. *Assessors of Holyoke* v. *State Tax Commn.*, 355 Mass. 223, 243-244 (1969). *Town Crier, Inc.* v. *Chief of Police of Weston*, 361 Mass. 682, 687 n.6 (1972). *Devlin* v. *Commissioner of Correction*, 364 Mass. 435, 439 (1973). *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. at 515-516.   See *Brooks* v. *School Comm. of Gloucester*, 5 Mass. App. Ct. 158, 163 (1977).

In addition, pertinent portions of regulations adopted by the United States Department of Transportation to implement the requirements of 49 U.S.C. § 1602a(b) (1973) (see note 14, *supra*) were introduced in evidence.   See 49 C.F.R., Part 605 (1976) — "School Bus Operations." These regulations exempt "tripper service" from the general ban against school bus operations by public carriers.   49 C.F.R. § 605.13 (1976). "Tripper service" means regularly scheduled mass transportation service which is open to the public and which is designed or modified to accommodate the needs of school children using various fare collection and subsidy systems so long as the buses carrying students are clearly marked as being available to the general public and stop only at regular service stops and travel routes included in the operator's published schedules.   49 C.F.R. § 605.3 (1976). The evidence warranted findings that SERTA's plan complied with the various requirements of "tripper service."

[18] We see nothing in *Chicago Transit Authy.* v. *Adams*, 607 F.2d 1284 (7th Cir. 1979), cert. denied sub nom. *Chicago Transit Authy.* v. *Goldschmidt*, 446 U.S. 946 (1980), which is inconsistent with our analysis or conclusions because the type of system and the schedule involved in that case were materially different from the plan we have considered. Nor do we consider the record adequate to pass on the question (which is not seriously pressed by any of the parties on appeal) whether SERTA's operations are exempt from the effect of § 7C by virtue of the grandfather provisions contained in St. 1976, c. 518, § 2.

that this aspect of the plan did not violate the transportation statutes was proper.

2. The plaintiffs next argue that the "award of a public school transportation contract in the absence of a sealed bid and in disrespect of specifications promulgated by the awarding authority violates . . . § 7A." We disagree.

Section 7A is in essence a reimbursement statute which permits a municipality to recoup some or all of its pupil transportation expenses for a contract awarded to a private company "upon the basis of prevailing wage rates . . . and of sealed bids." The statute specifically provides that any expenses submitted for reimbursement are to be rejected if the Commissioner of Education determines that the expenses have been incurred for transportation which "is not authorized *hereunder* or has been incurred pursuant to any contract awarded in violation of any provision *of this section* . . ." (emphasis supplied).

Section 7B, on the other hand, authorizes reimbursement of "part of the cost not reimburseable under section seven A." This statute makes no provision for sealed bids or minimum wage rates, as required for reimbursement in § 7A. The language in the two statutes is relatively straightforward — as such it furnishes the primary source for their construction. We are satisfied that § 7A is limited to contracts framed thereunder and that where a municipality resorts to public transportation under § 7B to bus its pupils, the competitive bidding features of § 7A do not apply as a condition precedent to engaging the public carrier or to obtaining reimbursement. It is also apparent from the record that Union Street made no attempt to bid on the contract, that the committee did not regard Union Street's submission as a bid, and that the committee would look only to § 7B for reimbursement of the cost of Union Street's services. In the absence of a specific provision in § 7B requiring that bidding procedures be followed, such procedures are not to be implied, but it is to be inferred that the contract (if one is involved) [19] is to be left to the reason-

---

[19] We need not express an opinion on whether the arrangement in this case resulted in a contract between the committee and SERTA. See G. L.

able judgment of the municipal agency charged with responsibility therefor. See *Archambault* v. *Mayor of Lowell*, 278 Mass. 327, 332 (1932), and cases cited; 10 McQuillin, Municipal Corporations § 29.31, at 328-329 (3d ed. 1966). *Deary* v. *Dudley*, 343 Mass. 192, 194 (1961). Cf. *Sears, Roebuck & Co.* v. *School Comm. of Burlington*, 3 Mass. App. Ct. 399, 402 (1975).

3. There is no merit to the argument that the committee's votes on August 2 and 9, 1977, were improper. The agreement establishing the school district and the committee's rules make it clear that the quorum for transaction of business shall be a majority of the committee and that no action shall carry unless it shall receive the vote of a majority of the committee's members. See *Third Sch. Dist. in Stoughton* v. *Atherton*, 12 Met. 105, 111-112 (1846). Likewise, the rejection of all the bids submitted under § 7A was proper under the rights reserved by the committee to reject "any or all bids." See *Deary* v. *Dudley, supra* at 194; 10 McQuillin, Municipal Corporations, *supra* § 29.77.[20]

*Judgment affirmed.*

c. 40, § 4; c. 161B, § 6(*f*). It appears from the evidence at the trial that neither of these parties regarded itself mutually bound by any agreement but that the committee would only pay for bus tickets actually used. What is important — and is clear from the evidence — is that no contract was executed pursuant to the requirements of § 7A.

[20] There is no necessity to discuss the judge's ruling with respect to the plaintiffs' bid preparation costs because nothing has been included in the judgment on that claim.